Points decided.

[Filed May 15, 1888.]

GEORGE WEAVER, ADM'R WITH WILL ANNEXED OF THE ESTATE OF HANS WEAVER, DECEASED, APPELLANT, *v.* ESTHER OWENS, IMPLEADED WITH C. W. JOHNSON, ADM'R OF THE ESTATE OF W. F. OWENS, DECEASED, RESPONDENT.

FRAUDULENT CONVEYANCE—EVIDENCE OF INTENT.—In a suit by a judgment creditor against a defendant to subject real property to the payment of the judgment, upon the grounds that the debtor purchased the property, and caused a deed thereof to be made to the defendant with intent to hinder, delay, and defraud the creditors of the debtor, the question of fraudulent intent is one of fact and not of law; and in order to entitle the plaintiff in the suit to the relief, he must establish such fact, either by direct proof, or by the proof of facts and circumstances from which the intent may reasonably be inferred, and he must also allege and prove that he was so hindered, delayed, or defrauded. In suits of the character referred to, the question of fraudulent intent must be determined from the facts and circumstances of the particular case decided. The law furnishes no test by which it can be determined further than it adjudges what acts are *indicia* of fraud, or which constitute badges of fraud.

ADVANCEMENT—FRAUDULENT INTENT.—Where it appeared that one O. bought a house and two lots at the price of eight hundred dollars, and had the deed executed to his daughter, a girl fifteen years of age, who was residing with her father and being supported by him; that O. was largely indebted at the time; that among his liabilities was one in favor of W. on account of the latter becoming security for him upon a bond of ten thousand dollars executed to the bank, to enable O. to obtain a credit for such amount; that O. had drawn from the bank nearly seven thousand dollars more than his deposits at the time the deed was executed; that about a month and a half thereafter O. gave a new bond to the bank for the sum of fifteen thousand dollars for the like purpose, upon which W. also became security, and the ten-thousand-dollar bond was surrendered; that O. continued his account at the bank for more than a year and a half after the execution of the deed, when his business collapsed and he suddenly died; that during the time referred to his indebtedness greatly augmented; that the day before he died he executed his promissory note to W. for the sum of three thousand dollars, supposed to have been on account of the latter's liability as such surety for him; that W. commenced an action against O. upon the said note on the day on which the latter died, and subsequently recovered a judgment against his administrator for the amount. And it appearing also, that O. was extensively engaged in business at the time of the execution of the deed, was receiving and paying out large sums of money, was the owner of lands and live stock, notes and accounts, appraised at his death at more than twenty-five thousand dollars; that his account at the bank, debit, and credit, between the time of the execution of the deed and of his death, amounted to fifty thousand dollars; that the balances against him at the latter time was on account of checks, drafts, and orders drawn by him upon the bank within the three or four months next prior to his death; that during the same period he received from and paid to other parties various sums of money amounting to many thousands dollars; that he promptly paid demands against him, and maintained his credit to within three months of his death; that he paid off all indebtedness

against him existing at the time the deed was executed, excepting one note of twelve thousand dollars, and he paid four thousand dollars upon that; but that he incurred other indebtedness, and died hopelessly insolvent. It also appeared that he purchased the house and lots subject to a mortgage of two hundred and fifty dollars, and that he turned in as part payment of the purchase price a plow and wagon. It further appeared that the conveyance of the property to the daughter was intended by O. as an advancement to her, similar to one he previously made to her elder sister; that the deed was not filed for record until the day before his death, but that he made no effort to conceal the fact; nor did it appear but that W. was cognizant of it when he signed the second bond; nor did it appear that he attempted to dispose of any of his other property in order to evade the payment of his debts. *Held*, by the majority of the court in a suit by the administrator of W. to subject the house and lots to the payment of the judgment upon the note, that such facts did not warrant the inference that O. caused the deed to be made to the daughter with intent to hinder, delay, or defraud his creditors, or that W. was so hindered, delayed, or defrauded in consequence thereof; that if the conveyance had included a considerable portion of O.'s property, thereby having the effect to deprive creditors of a material part of their security, or have crippled him in the prosecution of his business, such an inference might reasonably be deduced; but the advancement in view of all the facts and circumstances of the case was too insignificant to justify it.

Per STRAHAN, J., dissenting.

VOLUNTARY CONVEYANCE BY ONE WHO IS INSOLVENT. — A voluntary conveyance to a child by one who is an insolvent, where he continues in the possession of the property and fails to put the deed on record unexplained, evinces a fraudulent purpose and design to keep the state of the title to the property concealed, and mislead those with whom the party had dealings.

VOLUNTARY CONVEYANCES — FRAUDULENT INTENT. — When a party conscious of his insolvent condition, causes the title to a piece of real property to be vested in his minor daughter, with the intent of placing it beyond the reach of his creditors, and fails to record the deed, and continues in the possession of the property, such transaction is fraudulent in fact, and a creditor may attack it for that reason.

SUBSEQUENT CREDITOR — WHO NOT DEEMED. — When a party is insolvent and continues in business, and is constantly contracting new debts and paying off old ones, and makes a voluntary disposition of his property, such *new creditors* are not to be deemed *subsequent creditors* within the meaning of those authorities holding that a subsequent creditor cannot attack a conveyance for fraud.

STATUTORY CONSTRUCTION. — The statute prohibiting fraudulent conveyances ought, for the purpose of accomplishing its objects, to be liberally construed.

APPEAL from a decree of the Circuit Court for the county of Douglas.

*J. W. Hamilton,* and *J. C. Fullerton,* for Appellant.

*Lane & Lane,* and *W. R. Willis,* for Respondent.

THAYER, J. — The appellant, as such administrator, on the twenty-fourth day of September, 1886, commenced an action in

said Circuit Court against the said W. F. Owens, upon a promissory note executed by him to the said Hans Weaver in his lifetime. A writ of attachment was issued in the action, and certain property belonging to said Owens was attached by virtue thereof. Owens died on the following day after the action was commenced; he, as a matter of fact, committed suicide. The action was continued against Owens' said administrator, and a judgment for the sum of $3,000 and costs was recovered therein, and an order granted to sell the attached property. Said property was sold in accordance with said order, and $602.71 realized therefrom. Subsequently a general execution was issued upon the judgment, which having been returned unsatisfied, the appellant brought a suit against the respondent to set aside as fraudulent a certain deed to lots 1 and 2, block 53 B, in railroad addition to the city of Roseburg, Oregon, executed by one W. H. Kearnan to the respondent on the fourteenth day of February, 1885, in which suit said Johnson, as such administrator, was included as a defendant, but failed to interpose a defense therein.

The appellant alleged in his complaint in said suit that on said fourteenth day of February, 1885, and prior thereto, the said W. F. Owens was largely indebted to Hans Weaver, appellant's testator, and to other parties, and that at said date, and at all times thereafter, was wholly insolvent; that the said Owens purchased the said lots from said Kearnan, well knowing his insolvent condition, and caused the deed thereto to be made to the respondent, his daughter, who was only about fifteen years of age, and who at the time was residing with her father, being supported by him; that said W. F. Owens caused the said property to be so conveyed, with intent to cheat, hinder, delay, and defraud the said Hans Weaver, and his other creditors, and for the express purpose of preventing the said property from becoming liable to the payment of his debts; that the respondent did not furnish the purchase money for said property, or any part thereof, and has no interest whatever therein, other than to hold the legal title for the benefit of her father.

The respondent by her guardian *ad litem* filed an answer to
the complaint denying all the material allegations therein con-
tained.   The case coming on for hearing before the said Circuit
Court upon the allegations and the proofs taken therein, the said
court found that it was not true that said Owens caused the said
deed to be so executed; and that the respondent was entitled to
a decree dismissing the complaint, which is the decree appealed
from herein.   The appellant's counsel insist that upon the com-
plaint, and the testimony coming here with the transcript, that
a decree should have been given in the appellant's favor for the
relief claimed in his complaint.   Said counsel have submitted a
list of authorities in support of their position, but the question
to be determined is purely one of fact.

The law adjudges that certain facts and circumstances in such
cases are *indicia* of fraud; but the intent must be proved and
found as a fact by the jury, where the case is tried by a jury,
and by the court, when it is to be determined by the latter.
The fraudulent intent is seldom susceptible of direct proof, but
facts and circumstances must be established from which it can be
reasonably inferred.   The statute declares that the fraudulent
intent shall be deemed a question of fact and not of law.   (Code,
§ 3062.)   Hence the same rules of proof apply to other cases
involving questions of a similar nature.

The allegation must be established by a preponderance of
evidence.   Nor will the establishment of the fact that the con-
veyance was made with the intent to defraud creditors be alone
sufficient to entitle a plaintiff to relief; he must aver and prove
that he was hindered, delayed, and defrauded.   The language
of the statute is that the fraudulent act "as against the person
so *hindered, delayed, or defrauded* shall be void."   (Concluding
part of § 3059 of the Code.)   The plaintiff must allege and
show, not only that the defendant did the act with the intent
mentioned, but that he was so hindered, delayed, or defrauded.

The complaint in the suit herein contains no allegations of
the value of the lots referred to, or that Owens paid any money
therefor, nor that the appellant's testator was in any manner
injuriously affected in consequence of the transaction.   How can

it be known from the complaint, or from the proofs as to that matter, whether Hans Weaver was not cognizant of the fact that W. F. Owens had the deed to the lots executed to the daughter, and acquiesced in it when he executed the bond on the twenty-seventh day of March, 1885, out of which the indebtedness to him is supposed to have arisen? There is no allegation in the complaint that it was done secretly or clandestinely, or that Weaver was ignorant of the fact; and the evidence discloses that Owens talked freely with other parties of his having purchased the property for his daughter.

It appears from the proofs that Owens wanted credit at the bank, and as collateral security for balances from overdrafts he executed bonds to the bank, and said Hans Weaver, R. Phipps, and others became sureties for him thereon. The first bond was for the sum of ten thousand dollars, which was executed some time prior to the fourteenth day of February, 1885. The amount of the bond was placed to Owens' credit upon the books of the bank, and he drew checks, drafts, and orders against it. The amount of his account varied from time to time; on the said fourteenth day of February the amount of balance on an overdraft was nearly seven thousand dollars. Subsequently, and on the twenty-seventh day of March, 1885, this bond was surrendered up, and another, for the sum of fifteen thousand dollars, was executed by the same parties and put in its place. Owens continued his account with the bank, which amounted, debit and credit, at the time of his death to fifty thousand dollars. The balances, I suppose, were made up daily, and the amount against him at his death was upon drafts, etc., drawn within the three or four months next prior thereto. How much that balance was does not appear from the briefs of counsel, but it will not be presumed to have exceeded the penalty named in the new bond. The inquiry then is, did Owens with intent to defraud Weaver out of his claim, on account of his becoming surety for him on these bonds, or either of them, cause the said two lots to be conveyed to his daughter as alleged? That question must be solved like any other question of fact. The reply must come from the proofs. It cannot be answered by meta-

XVI. Or.—20.

physical reasoning drawn from supposed facts or adjudged cases. Every case involving such a question must be determined by its own peculiar circumstances.

The abstruse distinctions made by courts in cases before them can be of very little assistance to us; we must take the facts established by the proofs in this case, and draw such inferences and conclusions as our knowledge of human affairs and our best judgment dictates. That, in my opinion, is the only proper course to be pursued. We sit here in this matter more in the capacity of a jury than of a court; and we should consider it in the light of that understanding of the dealings and transactions of men in general, which is gained from observation and expe-- rience. The evidence upon the part of the appellant given in support of the allegation of a fraudulent intent upon the part of Owens in having the lots deeded to his daughter is very slight and inconclusive.

The deposition of J. J. Thornton, a witness on behalf of the appellant, shows that witness and his father had a mortgage on the lots for two hundred and fifty dollars; that witness met Owens and Kearnan in the court-house looking over papers, the mortgage he "reckoned," and Mr. Owens told him that he would pay the mortgage, and to let it run until the time run out; that he did not know what was the consideration paid to Kearnan for the property, "only what Kearnan told him." Upon being asked what Kearnan told him he answered, under objection, that if he had not forgotten it was eight hundred dollars.

The deposition of A. W. Caulfield, another witness for the appellant, shows that he, witness, performed labor on the building on the lots, but the time he could not specify; that Owens hired him to do the work and paid him; that it was after the reported sale from Kearnan that Owens said he had bought the lots; that he supposed Owens was in possession of the property; that he seemed to have control of it; but about that same time he claimed that he had given the lots to Esther. He remarked that Effie, the oldest girl, was displeased because he had given Esther the Kearnan house, which was a better house than the

one he had given her; that he said this at the time witness was working on the house; that he judged from what he had heard that Esther, on the fourteenth day of February, 1885, was about fifteen years of age; that she lived with her parents.

This is the substance of the entire evidence regarding Owens' purchase of the lots for the daughter. Copy of the deed was given in proof, and formally recites a consideration of eight hundred dollars as paid, but does not state by whom paid, and it appears therefrom that the deed was filed for record September 23, 1886. The note upon which the judgment was recovered in the action was for the payment of three thousand dollars, and bears the same date of the filing of the deed for record. All the other evidence in the case was addressed to the question of Owens' financial condition, and I agree fully with the circuit judge, "that as to whether Owens was insolvent on February 14, 1885, I am unable to find from the evidence in the case."

The deposition of W. S. Humphrey, a witness for the appellant, shows that on or about the fourteenth day of February, 1885, said Owens was indebted to the banking firm of Humphrey and Flint, of which witness was a member, nearly seven thousand dollars; that the indebtedness accrued by checks, drafts, and orders drawn on the firm by Owens, and paid by them; that the checks, etc., were not paid on Owens' individual security, but under a bond upon which Weaver, Phipps, and others were security as before mentioned; that witness did not know what property Owens possessed at that time.

Upon cross-examination witness was asked: "Whether it were not a fact that Mr. Owens had an account with you in the bank, and that he had paid in and drawn out since the fourteenth day of February, 1885, a large amount more than he was owing you at that date?" To which the witness answered: "Yes, sir; I would think that he had; I could not say." The witness was also asked the following: "Has he not paid in and drawn out as much as fifty thousand dollars from that time to the time of his death?" To which the witness answered: "I should think he had."

The deposition of W. S. Hamilton, a witness for the appel-

lant, shows that Owens was indebted to S. Hamilton, on the fourteenth day of February, 1885, upon a promissory note, to the amount of twelve thousand dollars; that four thousand dollars of the principal of the note was paid in August or September, 1886; that the balance remained unpaid; that the note was given January 29, 1884, and that Hans Weaver signed it as security; that Owens had no property on the fourteenth day of February, 1885, that witness was certain of; that witness had a conversation with Owens about the purchase of the lots shortly after he purchased them, and that Owens said that part of the consideration was a plow and a wagon; that he turned them in on the trade.

Upon his cross-examination the witness stated that Owens was in the commission merchant business; was doing a large business in buying grain, wool, and such things; that as far as witness knew, Owens continued to do business and pay demands against him until a very short time before his death.

The said C. W. Johnson, administrator of Owens' estate, was called by appellant as a witness, and testified, that the value of the assets of the said estate, as appraised, amounted to $25,598.41, against which there had been filed counter-claims amounting to $5,987.93; that none of the assets were real property, but consisted almost wholly of notes and accounts; that he supposed three or four thousand dollars would be collected; that the reason the amount as appraised could not be collected was principally because the books were kept in such a way; that while the accounts appear to be straight, it would be proven that they are almost wholly erroneous; that the liabilities of the estate, so far as claims against it had been presented, amounted to $61,026.42, and he was reasonably satisfied that there was at least $40,000 of outstanding claims which had not been presented. The witness was asked to state from the books, letters, papers, and other data in his possession, whether or not said Owens was solvent on the fourteenth day of February, 1885. To which he made answer that he was reasonably satisfied Owens at said date was entirely insolvent. This testimony, however, was clearly incompetent.

The witness upon cross-examination stated that he did not know of any debt due to Hans Weaver at that time which had not been paid, nor any debt that Hans Weaver, or his administrator since his death, had paid for Owens as security or otherwise.

The deposition of Asher Marks, a witness for the respondent, shows that witness had known said Owens since childhood, twenty-five or thirty years; that his business was grain and wool, etc., commission merchant; that he had had financial dealings with Owens since the fourteenth day of February, 1885; that during that time Owens had been indebted to him in the course of his business dealings with him as much as ten or fifteen thousand dollars; that the various sums of indebtedness since that time together would probably amount to twenty-five or thirty thousand dollars, and that Owens paid the same; that he had fair opportunities, in some respects, of knowing the manner in which Owens conducted his business, and that he thought he was solvent at as late a period as February, 1886.

In answer to questions upon cross-examination, the witness stated that he knew enough of Owens' solvency at that time not to be afraid to trust him; that he could not swear Owens was solvent, but it was his judgment that he was; that from what he had ascertained about Owens' affairs since his death, it appears he was not solvent February, 1886. Witness thought that Owens had, on the fourteenth day of February, 1885, in notes, accounts, stock, cattle, and everything he had, property to the value of twenty thousand dollars; that from the amount of Owens' liabilities, ascertained at his death, witness was of the opinion that he could not have been solvent in February, 1885, or at any time thereafter.

Upon redirect examination, the witness was asked the following question: "Do you not know that he (referring to Owens) paid off all claims presented to him up to within a year of his death?" To which he answered: "I think he did." Also the following: "Do you know of any debt that he owed that he did not pay off when demanded up to within a year of his death?" To which the witness answered: "I do not; he always paid me."

The witness gave further testimony upon that point, and others were called who testified substantially to the same effect. From all the evidence in the case it may be inferred that Owens carried on the business in which he was engaged for a number of years upon a large scale; that he had the confidence of the community, obtained extensive credit, and conducted his business mainly upon borrowed capital; that he was not lacking in energy, was not addicted to any vices, met his engagements with reasonable promptness, but was generally unthrifty, and signally failed in the end. His financial course was by no means a commendable one, though it is the same that thousands have followed. It is a course pursued by a class of vain and ambitious persons, devoid of caution, prudence, and foresight, and which is certain to terminate in monetary disaster. Such persons are not actuated by dishonest motives; they intend to be upright, though their necessities often force them to do acts of a suspicious character. They are always hopeful and sanguine, and their faith in their ultimate success never fails until they are overwhelmed with ruin. W. F. Owens probably never intended to wrong any one. He conceived that it was his mission to do good, and he doubtless expected, not only to liquidate all his liabilities, but also to acquire such a fortune as would enable him to be a benefactor, and in my opinion it would be unkind and uncharitable to conclude that he swapped the plow and wagon for the lots, and took the deed in his daughter's name, with intent to cheat his surety, Weaver, or any one else; nor can such intention be gathered fairly from the evidence. It appears therefrom that Owens, at the time the lots were purchased and the deed executed, was at the height of his imaginary success; he was receiving and paying out large sums of money amounting to thousands of dollars, compared to which the eight hundred dollars, purchase price of the lots, was a very small trifle. There is not a lisp of testimony in the case showing that he ever attempted to dispose of any of his other property, consisting of land, cattle, notes, and accounts, appraised after his death at more than twenty-five thousand dollars, to delay or defraud his creditors. His credit was good at the time, and he

made no effort to conceal what he did. The deed, it is true, was not put upon record when executed, but if it had been it would not practically have imparted any notice.

The recording of a deed will enable a subsequent purchaser of the property to ascertain the condition of the title, because he will search the records and find out; but as to third persons generally, it affords no notice in fact. In a town of the size of Roseburg such matters are learned much more readily from gossip than from the county records. It seems to me that to require a court to believe from the facts and circumstances of this case that Owens had the deed to the lots executed to his daughter, with the intent of preventing the property from becoming liable to the payment of his debts, overtaxes credulity. It is not a case where a debtor has voluntarily disposed of a material part of his property, seriously affecting his ability to pay his debts; nor one in which he has diminished his capital by settling upon members of his family such a portion of it as to cripple his business operations. It was a trivial advancement to his daughter, similar to one which he had previously made to an elder daughter, an act which Hans Weaver would undoubtedly have commended, and very probably did approve of. If Owens had purchased a piano and given it to the girl, no creditor, nor probably the administrator of any creditor, would have objected to it; and yet the grounds for charging it to have been done with a fraudulent intent, as against Owens' creditors, would have been equally tenable. There are no facts from which the inference of an intent upon the part of Owens to defraud his creditors can be drawn, except that he was indebted at the time, was, as a matter of fact, insolvent, and the advancement was a voluntary settlement. Such an inference might be justified, if the cost of the lots had been a considerable portion of Owens' property; but as it included only the paltry sum of eight hundred dollars, made up of a plow and wagon, and the assumption of a mortgage upon the property for two hundred and fifty dollars; that the transaction took place before the actual debt in question accrued, during which time Owens received and disbursed thousands of dollars; and that no general intention is

shown on his part to defraud his creditors, such an inference to my mind would be absurd. The inference in such cases must be founded on facts legally proved, and such a deduction from those facts as are warranted, among other things, by a consideration of the particular propensities or passions of the person whose act is in question. (Code, § 773.)

W. F. Owens certainly exhibited no propensity to dispose of all his property, or any material part thereof, so as to prevent it from being applied to the payment of his debts. If he had entertained any such disposition, he would not have been likely to have paid the four thousand dollars to S. Hamilton in August or September, 1886, a year and a half or more after the lots were deeded; nor have paid in at the bank the seven thousand dollars overdraft, which had been drawn when the deed was executed, and the various sums to Asher Marks and others. If such had been the bent of his mind, he would not probably have stopped with securing to his own use and benefit the little dab of property which the lots constituted. I am very strongly impressed with the belief, from all the facts and circumstances as shown herein, that the charge in the complaint of the fraudulent intent upon the part of Owens in the affair considered is not sustained; and that the findings of the Circuit Court cannot be disturbed unless we abandon that course in which intuitive sense and reason are the safest and surest guides to truth, and follow the tortious pathway of vagary. It is not a question of law we are dealing with, but, as said in the outset, a pure question of fact; and the deductions to be drawn are those which our reason makes from the facts proved, without an express direction of the law to that effect. (Code, § 771.)

I am of the opinion that the decree appealed from should be affirmed.

LORD, C. J. — Upon the facts as presented by this record, I concur in the result.

STRAHAN, J., dissenting. — This is a suit prosecuted by the appellant as administrator with the will annexed of Hans Weaver, deceased, to subject certain real property now held in the name of

the defendant Esther Owens to sale to satisfy a judgment recovered by the plaintiff against the defendant Johnson, as administrator of the estate of W. F. Owens, deceased. It appears from the evidence that on the fourteenth day of February, 1885, W. F. Owens purchased the property in controversy of W. H. Kearnan for the consideration of $800, and caused the same to be conveyed to his infant daughter, Esther Owens; but the deed was never filed for record until the twenty-third day of September, 1886. That Owens entered into the possession of said real property and improved the same, and continued in the possession thereof up to the time of his death. Prior to February 14, 1885, Hans Weaver, plaintiff's intestate, and R. Phipps had become surety for Owens to Humphrey and Flint, bankers at Roseburg, in the sum of $10,000, and said liability, or the greater portion thereof, still existed when the deed in question was made. On the twenty-seventh day of March, 1885, the plaintiff's intestate, Hans Weaver, and R. Phipps became surety for Owens to said Humphrey and Flint in the sum of $15,000. On the twenty-fourth day of September, 1886, the plaintiff commenced an action against W. F. Owens in the Circuit Court of Douglas County to recover $3,000, and caused the property in controversy to be attached. On the twenty-fifth day of September, 1886, said Owens died intestate, in Douglas County, Oregon, and the defendant C. W. Johnson was duly appointed his administrator, who was substituted as defendant in said action for Owens, and by order of the court said action was continued against him as such administrator, and so prosecuted that the plaintiff recovered a judgment for the sum of $3,000, and the attached property was ordered to be sold. Some property other than that now in controversy was also attached from the sale, of which $602.71 was realized. The necessary facts are alleged in the complaint to present for our decision the fraudulent intent and purpose of Owens in causing said property to be conveyed to his infant daughter; his inability to pay his debts at the time, and that he was insolvent then, and so continued up to the time of his death; that Esther paid nothing for said property, and never had any interest therein

except to hold the legal title thereof for her father's use and benefit.

The cause was referred and the evidence taken in writing, from which the court found the fact in favor of the plaintiff, and dismissed the suit, from which decree this appeal is taken.

1. There is no conflict in the evidence. W. F. Owens at the time of his death was indebted to various persons, including the plaintiff's intestate, in the aggregate sum of at least $100,000, and the only assets which he left were some accounts and notes, appraised at $25,598.41, from which the administrator says only from $3,000 to $4,000 can be collected. It does not appear that during any of the time from February 14, 1885, to the time of his death Owens owned any property that could have been reached by execution; the witness knew of no such property. It is true he received and paid out large amounts of money during that time; but he was engaged in buying and selling grain, wool, etc., and in the absence of direct proof on that subject, it is to be presumed that he conducted that business in the usual way; that is, he received advances from time to time from persons wishing to purchase, and the seller received the money from Owens, and the only interest that Owens had in the transaction was to act as "middleman" between seller and buyer, and to receive his commission. There is no attempt on the part of the defendants to prove that at or during any of the time from the date of the deed conveying the land in·controversy to Esther and the death of Owens, he sustained any large losses or reverses of any kind in business, or to prove that during any part of said time he had any visible property which could have been reached by creditors or subjected to the payment of their claims. It appears clearly from the evidence that at the time Owens caused the deed to be made to Esther he was utterly insolvent, and so continued to the time of his death; but it also appears that during the same time he continued in business, buying and selling produce and contracting new debts and paying off old ones, and for this purpose he frequently secured loans. It does not appear that during that time he made any gains; what losses he sustained does not clearly appear, although Asher Marks, a very

intelligent witness on the part of the defendants, and who had considerable knowledge of the Owens' business, says that his losses continued from the time he commenced business up to his death, which would cover a period of several years. The administrator testifies that about $60,000 of claims have been presented to him and allowed, and that he knows of about $40,000 more which had not been presented.

Mr. Humphrey explains the transaction of Owens, Weaver, and Phipps at the bank. He says: "When they gave the new bond, he (Owens), drew on the amount due on the old bond and took credit due on the *old bond.*" In further explanation of the same matter he says: "As I stated before when we took the new bond, and he drew his check and *took credit for* the amount due on the old bond, I presume there would be nothing due on the old bond. I suppose that it would wipe that out, or at least we do not hold for anything drawn on the old bond, as it was all brought under the new bond. That is, as I understand this evidence, there was some portion of the $10,000 covered by the first bond which Owens had not drawn when the new security was given. For that balance he drew his check, and it was by mutual consent carried forward as a part of the new credit, which he obtained at the bank by the execution of the new bond of $15,000." It also appears that Owens at the time of his death owed Humphrey and Flint a considerable sum on account of these bonds, in explanation of which Mr. Humphrey testifies that a part of what was drawn by Mr. Owens under the bond which was in force on the fourteenth day of February, 1885, the date of the deed, goes to make up the amount that Owens owed Humphrey and Flint at the time of his death, and those are some of the charges against him. It does not appear when or how the particular indebtedness of $3,000 sued on accrued, but the note bears date September 23, 1886, just two days before Owens' death, and the same day the deed to Esther was recorded.

2. Owens was in the possession of this land when this note was made, and it is not pretended that there was any change of possession on that day. The deed was recorded on the same day, but it does not appear whether it was before or after the note

was made, nor as I view the subject, is it material. The fact that he continued in the possession of this property, and never put the deed to his daughter on record until his insolvency was known, I think evinces a fraudulent design and purpose to keep the real state of the title to this property concealed, and to mis- lead those with whom he had dealings. When the catastrophe overtook him and exposure could not be avoided, when further concealment became dangerous, he then placed the deed on record. Under the facts disclosed by this record, I think this conveyance ought to be held to be fraudulent as to this plaintiff. Taking the most favorable view of the facts for the defendants, all that can be claimed for them is that Owens was insolvent and was endeavoring to save something from the wreck for his daughter, at all events, and without regard to his ability to pay his debts. This would render the transaction constructively fraudulent. But I think the facts justify and require us to draw a stronger inference against the defense, and that is, that at the time Owens caused this deed to be made he was conscious of his insolvent condition, and was desirous of placing this par- ticular piece of property secretly beyond the reach of his creditors. No doubt he had a vague hope that he might be able to meet his liabilities, and would have done so if it had been possible; but he intended if the worst should come to place the deed on record, and let his daughter hold the property if she could. This view of the case renders the transaction fraudulent in fact, and enables any creditor to attack it for that reason. (Code, § 3059.) But counsel for respondent argued that no person other than an existing creditor at the time of the transaction could question it for fraud. I doubt whether or not that rule ought to be applied to this case under any possible aspect of the facts. Here the transaction is conceded by the defendants' counsel to have been fraudulent as to existing creditors. But where a party is insolvent and continues in business, and is constantly contract- ing new debts and paying off old ones, and makes a voluntary disposition of his property, such new creditors are not to be deemed *subsequent creditors* within the meaning of the rule invoked by counsel.

In *Savage* v. *Murphy*, 34 N. Y. 508; 90 Am. Dec. 733, this principle was involved, and the court said: "The indebtedness then existing was merely transferred, not paid, and the fraud is as palpable as it would be if the debts now unpaid were owing to the same creditors who held them at the time of the transfers." A like principle is announced in *Paulk* v. *Cooke*, 39 Conn. 566. The court said: "But it is said that the debts which existed at the time that conveyance was made have since, with one exception, been paid; and that a voluntary conveyance can be impeached only by those who were creditors at the time, not by subsequent creditors. This principle clearly has no application, where there has been a continued, unbroken indebtedness. The debts are owed, though they may be due to new creditors. It is the most unsubstantial mode of paying a debt to contract another of equal amount. It is the merest fallacy to call such an act getting out of debt. From the time of this conveyance, Mr. Cooke continued to be in debt, and at the time of this assignment that indebtedness had largely increased. His means of payment had even more largely diminished." And the court ordered the property conveyed to be applied to the payment of the *subsequent* debt. And in *Savage* v. *Murphy*, 8 Bosw. 75, Hoffman, J., reviewed the earlier decisions by which subsequent purchasers and creditors were permitted to question conveyances as being fraudulent, and then laid down this proposition: "When a deed is made to defraud creditors by one at the time in debt, and who subsequently continued to be indebted, it is fraudulent and void as to all such subsequent, as well as existing creditors." And a late writer sums up the doctrine thus: "The embarrassment of the debtor when the transfer was made calls into being the claims of, and obligations to the creditors; the deficit then existed, and the liability has been merely transferred to new parties, while the debtor's embarrassed estate has been further crippled or rendered hopelessly insolvent by the voluntary alienation. It seems to follow that the safer and more prudent rule would be to hold that no voluntary conveyance by an *embarrassed* debtor should be upheld against creditors whether their claims accrued prior or subsequent to the transfer."

(Wait's Fraudulent Conveyances, § 99.)    Other authorities sustain the same proposition.    (*Iley* v. *Niswanger*, 1 McCord Ch. 519; *Beach* v. *White*, Walk. Ch. 496; *Herschfeldt* v. *George*, 6 Mich. 456; *Hurdt* v. *Courtenay*, 4 Met. [Ky.] 139; *Lowry* v. *Fisher*, 2 Bush, 70; *Ridgeway* v. *Underwood*, 4 Wash. C. C. 129.)

In *Ridgeway* v. *Underwood, supra,* Judge Washington cites numerous authorities on this subject, and concludes that "if the grantor, at the time the deed was made, was indebted to the extent of insolvency, or perhaps of great embarrassment, so as to create a reasonable presumption of fraudulent design, the deed may be impeached by a subsequent creditor, unless the presumption is repelled by showing that such prior debts were secured by mortgage or by a provision in their favor in the deed itself." To the like effect is 1 Am. Lead. Cases, pp. 43, 44; *McElwee* v. *Sutton*, 2 Bail. 128; *Madden* v. *Day*, 2 Bail. 575; *Smith* v. *Lowell*, 6 N. H. 67; *Parkman* v. *Welch*, 19 Pick. 231. The Statute of 13 Elizabeth, chapter 5, protects creditors and *others*. This provision is incorporated in the Code (§ 3059), and it has always received a liberal construction in allowing to persons who are, or might be, injured by a fraudulent conveyance the character of *creditors*. (1 Am. Lead. Cases, 45.)

For the reasons here given I am unable to concur in the conclusions reached by my brethren. I think the plaintiff, both upon the facts and the law, is entitled to the relief prayed for.