Argued November 29, 1951, affirmed January 30, 1952

EVANS *v.* TRUDE ET AL. and CHAMPLIN ET AL.

240 P. 2d 940

*Lynn Moore,* of Springfield, argued the cause and filed briefs for defendants-appellants.

*George Rhoten,* of Salem, argued the cause for plaintiff-respondent. On the brief were Rhoten & Rhoten.

No appearance for defendants-respondents.

Before BRAND, Chief Justice, and HAY, LUSK, LATOURETTE and WARNER, Justices.

WARNER, J.

Jack L. Evans, the plaintiff, is a judgment creditor of Dale W. Trude. He brings this suit to set aside as fraudulent the debtor's deed to the defendant, Pearl Trude, his mother. He also seeks a declaration that Dale W. Trude is the owner of an undivided one-half interest in the premises described therein subject to the lien of plaintiff's judgment. The property is situated in Salem, Oregon. From a decree in favor of plaintiff and preserving the respective rights and interests of the defendants, Fred J. Champlin and Popira M. Champlin, his wife, and May Gibson, the defendants, Pearl Trude and James A. Trude, her husband, alone appeal.

A rather full and chronological statement of events, both antecedent and subsequent to the giving of the disputed conveyance, with emphasis on significant dates, is essential to a correct understanding of the grantor's and grantee's relationship to the challenged deal and our conclusions.

Prior to August, 1945, the appellants Trude resided in the state of Minnesota. They came to Oregon that year and established a home in Springfield, where they presently reside. Their son, Dale Trude, followed them to this state in September, 1947, settling in the city of Salem where he obtained employment as a field auditor with the State Tax Commission. Shortly thereafter, Dale learned that some houses in Salem were to be sold as salvage and, believing that their purchase offered an opportunity for making a profit on resale, inter-

ested his father in the speculation. The defendant, James Trude, had experience as a builder and at various times acted as a contractor on his own account and was, indeed, then engaged in the building of houses for resale in the Springfield area where he operated under the name of Progress Construction Company. The proposition presented by Dale to his father contemplated the buying of one or more of the salvaged Salem houses, moving them to new premises, and there remodeling them for resale. Dale represented that he would be willing to put in what spare time he had from his job and handle all the business incident to the transactions, if his father would put up the required capital.

These negotiations between the father and son resulted in the purchase of three units on October 4, 1947, for a price of $500. James Trude advanced the necessary money for that purpose. Dale was entrusted with the responsibility of finding a lot upon which to move one of the houses for remodeling. He found the property, which is the subject of this litigation. It was he who made all the arrangements for its purchase. It was acquired on October 23, 1947, from Mr. and Mrs. James Linn through Salem real estate brokers, and again James Trude laid out the $900 required as the sale price. The deed for this property, which we will hereafter refer to as the "Linn deed," ran to Dale W. Trude and James A. Trude "as joint tenants." Dale and his father thereafter spent all their spare time remodeling the house which was subsequently moved to it.

Although the Linn deed bespeaks the ownership of an undivided one-half interest in both the father and son, it is claimed by the appellants that under the true arrangement between them, Dale should only be paid for his trouble in handling the transaction and for the

labor expended by him on the house by receiving credit for one half of any net profit made on resale; but the profit, if any, was to be applied as credit on a debt which appellants claim Dale owed them by reason of loans which they had made to him while he yet lived in Minnesota and a further loan of $750 which they say they had made to him shortly after he came to Oregon.

On January 15, 1948, the plaintiff, Jack L. Evans, sustained severe personal injuries as the result of a collision with an automobile driven by Dale Trude. The severity of Evans' injuries required, among other things, the amputation of his left leg. Prior to March 19, 1948, Dale was relying on an insurance company to protect him against claims arising out of the injuries sustained by Evans. Notwithstanding that he had at one time been an agent in the east for this very insurance company and was familiar with all the terms and conditions of its liability coverages, he made certain false and fraudulent representations to it concerning the automobile involved in the accident. This he confessed while on the witness stand in the trial of the instant case. The insurance company, after an extended investigation, formally advised Dale Trude, about March 19, 1948, that it would not protect him against the claims of Evans arising out of the accident referred to.

Dale, from his negotiations with the insurance company, had reason to anticipate its final refusal to accept any responsibility and grew apprehensive, for on March 17, 1948, he and his wife executed a quitclaim deed conveying all their right, title and interest in the subject property to Pearl Trude, Dale's mother, for a recited consideration of $10. This, so Dale tells us, was done at his father's direction. He retained the deed, how-

ever, and did not deliver it until after he was certain that Evans would sue him.

On April 6, 1948, the plaintiff herein filed a damage action in the circuit court for Marion county, Oregon, praying for general and special damages against Dale Trude in amounts aggregating $40,234.80. The very next day the quitclaim deed from Dale and his wife to Pearl Trude was delivered to the defendant, James Trude, and by him recorded on April 8, 1948.

Pursuant to arrangements made by Dale Trude, the defendants, James Trude and his wife, on May 17 obtained a mortgage loan of $1,800 on the property. This mortgage was later assigned by the mortgagee to May Gibson, who at the time of trial was its owner and holder, together with the note secured thereby. It is by reason of her ownership of this lien that she was made a party defendant.

On June 26, 1948, the appellants sold the property here involved under a land sale contract to the defendants-respondents, Fred J. Champlin and Popira M. Champlin, his wife, for a price of $5,750. This, too, was the result of negotiations carried on by Dale in the names of his father and mother. At the time of trial, the Champlins were in possession of the property under this contract, and for that reason they were properly made parties defendant herein.

Through his attorneys, Dale filed an answer to the complaint in the damage suit. That case was tried before a jury on October 19, 1948, without, however, the presence of Dale for the reason that earlier in October of that year he had absconded from the state, fleeing to the state of Arizona in an automobile owned and supplied by his father. There he remained for some time. The trial in the damage case resulted in a verdict in favor of the plaintiff Evans for the full sum of

$40,238.80 and costs. The entry of judgment was followed by the issuance of an execution on the judgment, which was returned by the sheriff unsatisfied. Nothing has ever been paid thereon.

The decree entered by the lower court in this matter cancelled and set aside Dale's deed of March 17, 1948, declared that Pearl Trude acquired no right, title or interest in the premises by reason of the deed, and found that Dale Trude's interest in the premises as a joint tenant was subject to the lien of the judgment obtained by Evans in October, 1948, but held that the interest of the defendant, May Gibson, under the mortgage executed by the parents of Dale Trude, was superior to all other liens or claims against the property. The court further decreed that the interest of the defendants Champlin as of the date of the commencement of this suit was unaffected and unimpaired by the invalidity of Dale's deed to his mother, and any balance due on the contract with the Champlins as of December 13, 1948, was declared to be subject to the lien of the judgment of the plaintiff Evans. The decree further directed that payments accruing from the defendants Champlin on the contract should thereafter be made to the clerk of the circuit court, subject to such orders as that court might thereafter make with reference thereto.

It is the contention of the plaintiff that the conveyance made by Dale Trude to his mother was fraudulent and made solely for the purpose of placing the property beyond the reach of execution upon the judgment previously obtained by Evans against Dale Trude.

■ A conveyance is declared to be fraudulent when its object or effect is to defraud another, or its intent is to avoid some duty or debt due by or incumbent upon the person making the transfer. *First Nat. Bank v.*

*Buckland,* 128 Or 242, 247, 273 P 393; *Clarke v. Philomath College,* 99 Or 366, 377, 193 P 470, 195 P 822.

 The law furnishes no test for determining the fraudulent character of a conveyance other than adjudging what constitutes badges of fraud. *Clarke v. Philomath College,* supra, at page 377; *Weaver v. Owens,* 16 Or 301, 304, 18 P 579. Badges of fraud or, as they are sometimes called, the indicia of fraud are accompanying circumstances tending to excite suspicion and distrust as to the bona fides of the challenged conveyance and which, standing unexplained, may warrant an inference of fraud. *Orsen v. Siegle,* 170 Or 153, 163, 132 P2d 409; 37 CJS, Fraudulent Conveyances, 922, § 79. The burden of proof to establish fraud is on the party who has the affirmative of the issue; yet when, as here, numerous badges of fraud exist, the burden of explaining the transaction will be shifted to the transferee, who in this matter is the defendant, Pearl Trude. *Orsen v. Siegle,* supra, at page 163; *Clarke v. Philomath College,* supra, at page 381; 24 Am Jur, Fraudulent Conveyances, 334, § 218. To repel the implications created by the presence of badges of fraud by showing that a full consideration was paid for the property, the proof of fairness and good faith is always more stringent. *Clarke v. Philomath College,* supra, at page 381. When a confidential relationship exists between the transferee and transferor, such as a son and his mother, this duty of explanation becomes more onerous; and such parties upon whose shoulders the burden of explanation rests are held to a fuller and stricter proof of the consideration and fairness of the transactions. *Branchfield v. McCulley et al.,* 192 Or 270, 231 P2d 771, 773; *Orsen v. Siegle,* supra, at page 163; Bigelow, Fraudulent Conveyances (rev. ed.) 216, § 2; Bump, Fraudulent Conveyances (3d ed.) 59.

Such transactions between near relatives are closely scrutinized by the courts. *Branchfield v. McCulley et al.,* supra; *Grandy v. Robinson,* 180 Or 315, 325, 175 P2d 463, and cases there cited.

The badges of fraud here are as clearly apparent as they are multitudinous. The compelling ones in terms of long-recognized indicia of fraud are: (1) The consideration as found in the quitclaim deed from Dale W. Trude to his mother is inadequate (*Willamette Grocery Co. v. Skiff,* 118 Or 685, 691, 248 P 143). The recited consideration was $10. The deed carried no revenue stamps as would have been necessary if it were delivered in payment of a debt in the amount claimed by the appellants. (2) The transfer of the property was in anticipation of a pending suit (*American Surety Co. v. Hattrem,* 138 Or 358, 365, 3 P2d 1109, 6 P2d 1087; *Crocker v. Russell,* 133 Or 213, 220, 287 P 224). The fact that the anticipated action was in tort does not affect the rule (37 CJS, Fraudulent Conveyances, 925, § 82). (3) The transferor-debtor was insolvent (*Crocker v. Russell,* supra, at page 220). (4) There was a failure to record the instrument within a reasonable length of time after execution without explanation for the delay (*Blackabee v. Seaweard,* 112 Or 675, 678, 231 P 146; *Clarke v. Philomath College,* supra, at page 378). The deed was executed March 17, 1948, but not recorded until April 8, 1948, two days after the filing of the damage action. (5) The conveyance was a transfer of all or substantially all the debtor's property (*Marion Automobile Co. v. Brown,* 127 Or 551, 558, 272 P 914; *American Surety Co. v. Hattrem,* supra, at page 365; *Crocker v. Russell,* supra, at page 220). (6) The retention of possession of the premises by the grantor from the date of the execution of the deed in March, 1948, to and until the sale of the

property to the defendants-respondents Champlin in the latter part of June of that year stands unexplained (*Blackabee v. Seaweard,* supra, at page 678) and also unexplained are the subsequent agency activities of Dale Trude in connection with the mortgaging and selling of the property previously conveyed to his mother (37 CJS, Fraudulent Conveyances, 928, § 92). (7) The transfer so completely depleted the assets of Dale Trude that his creditor, the plaintiff, has thereby been hindered and delayed in recovering any part of his judgment (*Clarke v. Philomath College,* supra, at page 379). (8) The relationship of the parties becomes an additional badge of fraud when there also appear other circumstances which of themselves incite distrust and suspicion (*Marion Automobile Co. v. Brown,* supra, at page 560; *Blackabee v. Seaweard,* supra, at page 677). The foregoing badges of bad faith, we observe, rest upon admitted allegations of the pleadings or uncontradicted evidence. There are others to which we will later make reference.

■ These badges of fraud cast upon Pearl Trude, the grantee of her son's deed, the burden of explaining them and proving, if she could, that the transfer was supported with a good consideration and made with a bona fide intent. *Clarke v. Philomath College,* supra, at page 377. This she has failed to do.

■ It is her contention that at the time of the initial acquisition of the title under the Linn deed on October 23, 1947, the purchase price was from funds in which she and her husband had a joint interest, as evidenced by their joint bank account; that the deed to the Trudes of that date, wherein it appears that the father and son were each the owner of an undivided one-half interest in the property, was an error resulting from "fraud or breach of trust"; and that the original deed should

have run to James Trude and herself as the sole grantees because of her interest in the funds advanced for the purchase price. She, therefore, concludes that a resulting or constructive trust in her favor arose out of the transaction. Proof of a resulting or constructive trust must be strong, clear and convincing. *Hughes v. Helzer,* 182 Or 205, 224, 185 P2d 537; *American Surety Co. v. Hattrem,* supra, at page 367.

The consideration for the Linn deed was $900, and the payment made is here evidenced by a check of the defendant, James A. Trude, drawn on the First National Bank of Eugene, Oregon, in favor of Burt Picha for $875. The balance of $25 had been previously paid in cash by Dale Trude as an earnest money payment from monies supplied by his father. In addition to the foregoing check, many others were introduced as evidence of advances made for the cost of improving the building moved upon the premises. All are drawn on the same bank; all are signed by James A. Trude alone.

We are not cognizant of any rule which holds that funds drawn from a joint bank account by one of the joint depositors and thereafter invested by him in some property, title to which stands in the name of the drawer or others, ipso facto creates or is any evidence of any title or interest in such property for the use and benefit of any other joint depositors.

Here, however, there is no evidence of the existence of any joint bank account other than the self-serving declarations of Mr. and Mrs. Trude that these checks were drawn against a joint bank account in which they had a fifty-fifty interest. Aside from their statements, the record is silent.

▪ The rule is well settled that the best obtainable evidence should be adduced to prove every disputed fact; and in the absence of an adequate showing that

evidence of that character is not obtainable, the presumption is that the higher evidence would be adverse from inferior being produced. *Anderson v. Adams,* 43 Or 621, 631, 74 P 215; *Scott v. Astoria Railroad Co.,* 43 Or 26, 34, 72 P 594, 99 Am St Rep 710, 62 LRA 543; § 2-407, subd. 6, OCLA. In this instance, if the existence of a joint bank account had, in fact, any evidentiary value, the best evidence to have proved Pearl Trude's one-half ownership in the purchase money would have been the records of the bank where the funds were on deposit. No explanation is given why they were not or could not have been produced.

■ We are told that the money in the so-called joint account "had been accumulated by the joint efforts of the defendants in Minnesota." If this is accepted as true, it projects into this matter another sound reason for rejecting Pearl Trude's claim to an interest in the subject property predicated upon the use of alleged commingled funds belonging to her husband and herself. Her claim of interest in the joint account, under the record here, is met and overcome by a rule of long standing in this jurisdiction. See *American Surety Co. v. Hattrem,* supra, at page 366, where we said:

" * * * the law is plainly laid down in Barger v. Barger, 30 Or. 268 (47 P. 702), that where a husband, without objection, uses his wife's money, jointly with his own, in his business ventures, no trust in favor of his wife can attach to the real property purchased with the proceeds of the business * * *."

Before concluding our examination of Pearl Trude's contention that by reason of a resulting trust, she owned the undivided one-half interest in the property which stood in the name of her son, we think it is interesting to note the son's specious and only explanation for the

appearance of his name as one of the grantees in the Linn deed of October, 1947. Recalling that it was Dale who found the Linn property, attended to all the negotiations closing the deal, and gave the directions which resulted in the inclusion of his name, as well as his father's, as a grantee in that deed, Dale, when asked why he was so named as a grantee, several times testified that it was only "to facilitate the handling of the property." When pressed to explain what he meant by "facility in handling the property," his answers were as follows:

"A The only reason I had that put in my father's name and my name was so—I was handling the business up here while he was in Springfield, and it was so I can sign for him so the papers wouldn't need to go to Springfield and back; to save time.

"Q Just a minute. Do you claim you had authority to sign away your father's interest in this real property, without your father signing?

"A No.

"Q You knew you didn't have that authority, didn't you?

"A Yes, that is correct.

"Q Why wouldn't you have to send the deed down to Springfield to get him to sign, as well as your signature?

"A My signature would only be temporary for him. That was the idea behind it * * * ."

This line of testimony came from a young man, at trial time 26 years old, who had a business college education which included a study of "the general business line" and which he stated gave him some familiarity with deeds; whose work as an auditor for the State Tax Commission in its income tax division occasionally required the examination of deeds; who ad-

mitted that he knew that by the inclusion of his name as one of the grantees, four signatures, (i. e., his father's, his and their respective spouses), would be required for any conveyance of the property and that to get the signatures of his parents, the instrument would have to be sent to Springfield or his parents would have to come to Salem for that purpose. We submit that had "facility in handling" been the real objective, a power of attorney would have sufficed. This puerile explanation coming from one of his business training and experiences places a too-heavy strain on credulity and must be repudiated as unworthy of belief.

We are persuaded that Pearl Trude's claim that she had any interest in the property as derived through a resulting or constructive trust is without merit.

The pleadings of the defendants Trude inject into this matter an anomalous situation which incites distrust as to the bona fides of Mrs. Trude's claim. In form, they introduce two separate propositions as the basis for her claim to title which, when read together, are contradictory. Paragraph III of their separate answer alleges that Dale W. Trude "erroneously or as a breach of trust, had his name placed as one of the Grantees in said deed rather than the name of the defendant, Pearl Trude * * * ." In this paragraph it was further alleged that the $900 consideration for the property was furnished by James A. Trude and Pearl Trude and that Dale W. Trude, the son, "*had no interest of any nature whatsoever in said parcel of real estate.*" (Italics ours.) It is also alleged that after the purchase of the property, the payments for the moving and improving of the house placed thereon were made out of the joint funds of James and Pearl Trude and "no consideration therefor at any time was fur-

nished by the said Dale W. Trude." This is followed by allegations to the effect that in 1945, while the Trudes were in Minnesota, they loaned their son various sums of money and later in 1947, after they had moved to Oregon, they had loaned him $750 and "that said sums have never been repaid to these answering defendants herein, *except as hereinafter alleged.*" (Italics ours.) This is followed by Paragraph V reading:

"That on or about the 17th day of March, 1948, these answering defendants herein made an agreement with Dale W. Trude that if he would quitclaim *any interest* that he might have by virtue of the original deed * * * [referring to the Linn deed wherein James A. Trude and Dale W. Trude were grantees]; and that said quitclaim deed should restore to the defendant, Pearl Trude, the legal interest which she had in said property and that the answering defendants *would consider the indebtedness owed by Dale W. Trude to these answering defendants as paid* and that in compliance with said agreement, the said Dale W. Trude, and his wife, Margaret Trude, made and executed that certain quitclaim deed, dated March 17, 1948 * * * ." (Italics ours.)

The foregoing answer, we submit, suggests two different considerations for the transfer of the property from Dale Trude to his mother, one on the theory that the quitclaim deed confirmed in her the title which she claimed under the resulting or constructive trust which she alleged was incident to the investment of her money in the original transaction; the other is predicated upon the theory that the quitclaim deed was given in full satisfaction of a debt alleged to be owing from the son to his parents by reason of loans made to him in Minnesota and after his first coming to Oregon. Appellants at the time of the trial modified their position with reference to Dale's alleged indebtedness to them. They

then claimed for the first time that the transaction had between the father and son with reference to the Salem property was under an arrangement whereby Dale should be paid for the trouble of handling the transaction and for the labor he expended on the house by receiving credit for one half of the profit on resale on the debt which he owed to his parents, and any share of profit over the amount owing to his parents should be paid to him. Nothing of this tenor is found in the Trudes' answer. Proceeding on this amended theory, the defendants Trude made an accounting of the proceeds of the sale of the Salem property to the Champlins which, according to them, resulted in a net profit of $992.49. One half of this they allocated to Dale in the form of a credit applied upon his alleged indebtedness to them. It will be observed that their position in this respect is not consonant with the allegations of Paragraph V of their further and separate answer, wherein they alleged that upon receipt of the quitclaim deed, "the answering defendants would consider the indebtedness owed by Dale W. Trude to these answering defendants as paid * * * ."

If, as alleged by appellants, a resulting trust accrued for the use and benefit of Pearl Trude by reason of the investment of her funds, then the extinguishment of any subsisting indebtedness of Dale Trude, as consideration for the quitclaim deed, was unnecessary. On that theory, she was entitled to have the cloud of Dale's apparent title cleared as a matter of right. If, on the other hand, the quitclaim deed was given in satisfaction of Dale's indebtedness to his parents, as indicated by appellants' answer and the testimony of James Trude, then there is a presumption that Dale was the owner of a valuable interest therein which, as also testified to by his father, was transferred "to prevent

Jack Evans from getting any of that property." Moreover, this state of the pleadings and testimony is, in our opinion, a manifestation of an excessive effort on the part of the appellants to give the appearance of fairness to the conveyance from the son to his mother. Such an effort is also a badge of fraud. *American Surety Co. v. Hattrem,* supra, at page 366.

We will ignore for the moment the inconsistency of defendants' overeager assertions in support of a good consideration and examine their offering of proof of the existence of a pre-existing debt. The indebtedness to which we now refer is the aggregate of various loans made to Dale while all the Trudes lived in Minnesota and contracted before their coming to Oregon. This indebtedness is in the amount of $540, and the additional amount of $750, represented by James Trude's check, advanced to Dale for the down payment on his personal dwelling in Salem acquired in September, 1947.

Mrs. Trude claims an interest in all this prior indebtedness, totaling $1,290, by reason of the fact that it was advanced by Mr. Trude out of "joint funds" in which she says she had an ownership interest. The $750 loan made to Dale in September, 1947, was drawn by Mr. Trude against the same bank account as were the checks drawn by him in payment of the purchase price of the subject property and the improvements later made thereon. That "$750 loan," for the reasons heretofore given, is wanting in proof that Mrs. Trude had any interest therein, and her claim of that character is also subject to the rule laid down in *Barger v. Barger,* supra (30 Or 268), and *American Surety Co. v. Hattrem,* supra (138 Or 358).

The claim relative to the $540 portion of that indebtedness rests solely upon the father's memory and oral

representations of its existence. No note, no books of account, no record nor writing of any kind or character is offered to attest its validity. The following from the testimony of James Trude is indicative of the status of the records in this respect:

"Q Now, you haven't produced here in court any book account of your dealings with your son, showing payments or credits in the accounts which you had with him, have you?

"A Not prior to the time he came out here.

"Q You haven't any account prior to the time you entered into the joint venture with him on the house?

"A No, sir, we haven't.

"Q So you are telling this court you had various dealings with various credits and charges as to money you let him have and that you received from him and you can't produce in court here today any record showing the details of that account; is that true?

"A That is true.

"Q As a matter of fact, you haven't any such record, have you?

"A No, sir; we had checks that were given to him for part of that money before we came out here, but we haven't kept those checks now.

" * * * * *

"Q But you didn't take his note for any of the money, did you?

"A No, we did not. We checked up and agreed what the balance was.

"Q And made no written memorandum of it at all?

"A Yes, we have a written memorandum but not in court.

"Q Where is that written memorandum?

"A At home."

Dale testified he had no separate account to keep track of his drawings from his father and that he could not say the amount which he owed his father at the time of trial or any other time. Mrs. Trude offered nothing to clarify the matter. It was her testimony that her husband "kept the books" and that she had nothing to do with them.

Failure to produce all available evidence (*American Surety Co. v. Hattrem,* supra, at page 366) and failure on the part of the grantees to keep a record of the dates of the loans or of the amounts claimed to have been lent to the grantor (*Boyd v. Coleman,* 135 Or 60, 64, 294 P 604) are further indicia of the want of good faith.

On the basis of the record here, we are compelled to reject the assertion that there was any indebtedness due from the grantor, Dale Trude, to the grantee, Pearl Trude, as of the date of the delivery of the quitclaim deed.

In *Orsen v. Siegle,* supra (170 Or 163), we held:

> "Where a conveyance is attacked on the ground that it was made 'with the intent to hinder, delay, or defraud creditors * * * of their lawful suits, damages, forfeitures, debts, or demands' (§ 70-407, O. C. L. A.), three things must concur to protect the title of the purchaser: (1) He must buy without notice of the bad intent on part of the vendor; (2) he must be a purchaser for a valuable consideration; (3) he must have paid the purchase money before he had notice of the fraud * * * ." See cases there cited.

■ The defendants Trude have not met the burden of proof imposed upon them. There is no evidence warranting a holding that any part of Pearl Trude's money was ever invested in the Salem property or loaned to her son, if, in fact, he was so indebted to his parents.

None of the three concurring elements required by the foregoing rule in *Orsen v. Siegle,* supra, is present here.

The fraud and chicanery practiced by the appellants upon the plaintiff with the connivance of their son, Dale, are so palpably evident in this case that we wonder at their temerity in attempting to tender any defense to the charges made by plaintiff's complaint. It is a record of a cruel and callous disregard for the mandates of justice and an inexcusable evasion of moral responsibility. The conduct of the son in his ready obeisance to his father's will and direction in a scheme to circumvent an invalid whose serious injuries were the result of the son's own acts of negligence, and the craven and hasty flight of that son from this state to escape any possible contribution in atonement, constitute a character record in which he can take neither pride nor consolation. One of the ironies of this unhappy story is that, notwithstanding our conclusion in favor of the plaintiff, his reward may prove small indeed. The value of Dale Trude's interest in the property before us appears to be so modest that when it is further reduced by the mortgage debt, the expenses of trial in the lower court and the expense of appeal to this court, plaintiff's recovery may be relatively insignificant in terms of his painful injuries and permanent physical handicap.

The decree of the lower court is affirmed.