Argued June 10, reversed and remanded September 13,
petition for rehearing denied October 11, 1977

ALBINO et ux, *Appellants,*
*v.*
ALBINO et ux, *Respondents.*
(TC 35-528, SC 24675)
568 P2d 1344

[ 537 ]

Frank E. Bocci, P.C., Eugene, argued the cause and filed the brief for appellants.

L. M. Giovanini, Beaverton, argued the cause and filed the brief for respondents.

Before Denecke, Chief Justice, and Howell, Linde and Campbell, Justices.

CAMPBELL, J., Pro Tempore.

**CAMPBELL, J.,** Pro Tempore.

This is a suit in equity to declare a constructive trust and to require the defendants to hold the sum of $18,380 in trust for the plaintiffs.

The plaintiff Victor P. Albino is the natural son of the defendant Catherina Albino and the stepson of the defendant Frank Albino. The plaintiff Madonna Albino is the wife of plaintiff Victor Albino.

The complaint alleges that in January, 1956, the plaintiffs entered into a written agreement to purchase Lots 3 and 4, Sunset View, located in Washington County, Oregon, from the agents of Catherina Albino for the sum of $8,500. The plaintiffs were credited with a down payment of $4,250 and made monthly payments upon the purchase contract until March of 1962, reducing the balance due to $1,620. In March, 1962, defendant Catherina Albino represented that she was in dire need of funds, whereupon the plaintiffs redelivered the real estate contract to her in order that she might sell the property for $23,000 to relieve her financial situation. The plaintiffs allege that they redelivered the contract without consideration and "in reliance upon their confidence in Defendant Catherina's promise to repay them." The defendants allegedly used the funds for their own purposes to the exclusion of the plaintiffs, except they did pay the plaintiffs the sum of $3,000. There was a balance due on the purchase price under the contract from the plaintiffs to defendant Catherina of $1,620. Therefore, the plaintiffs prayed that the balance of the sale, the sum of $18,380, be held in trust. The plaintiffs also asked for punitive damages.

The defendants' amended answer denied the plaintiffs' complaint and by way of an affirmative defense alleged that the plaintiffs should be barred by laches.

The trial court found for the defendants and dismissed the plaintiffs' complaint. We review de novo. ORS 19.125.

At the time of trial the plaintiffs, Victor and Madonna, had been married 29 years. Madonna was 54 years of age. Victor's age is uncertain, but he was born before 1924 and was in the military service in World War II. The plaintiffs have lived all of their married lives in Eugene. Madonna completed one year of college in Iowa. She taught in kindergartens and rural schools and worked as a waitress. Victor managed a club in Eugene for 18 years. He had some health problems in 1971 caused by a heart attack.

The defendants, Catherina and Frank, were married in 1924, divorced in 1956, and remarried in 1970. At the time of the trial Catherina was 83 years of age and Frank was 79. Catherina had a total of nine children, of which five were born to her and Frank. Both defendants' formal education was limited to three years of school in Italy. As late as 1965, at least a part of Catherina's correspondence was written in Italian. Frank had worked as a coal miner in Utah and as a carpenter in the Beaverton area. Catherina, or "Mama," had never worked outside the home, but she had developed an expertise in buying and selling real property in Washington County. She had a business card printed with her name, a red rose, and the words "Property Investments."

Catherina did not testify at the trial. Frank was Catherina's power of attorney and between them they own five rental houses and have overall assets in excess of $100,000.

In June, 1951, Madonna and Catherina entered into a contract to purchase Lot One of Block E in Steele's Addition to Beaverton for the sum of $12,000. Each of them paid one-half the required down payment of $1,000. The balance was to be paid in monthly installments of $100, including interest at the rate of 5 percent per annum. Although Madonna did pay taxes in 1954 and 1955 totaling $505.65, she testified that she did not pay any of the monthly installments because Catherina had arranged that the rent would

pay the taxes and the contract balance. The defendants contradicted that asssertion by pointing out that some of the tenants did not regularly pay their rent and that at least one tenant had to be sued. In March, 1967, Catherina granted a 10-year lease on the property for $75 per month plus the taxes. Madonna refused to join in this lease. The contract balance was ultimately paid, and in July, 1968, Madonna and Catherina received and recorded a warranty deed vesting them with the title to the property as tenants in common.

The plaintiffs claim that prior to January, 1956, they had been sending to Mama at irregular times various amounts of money for investment in real estate. These sums totaled $4,250 and were separate and apart from Madonna's one-half interest in the lot in Steele's Addition. Plaintiffs believed that Mama was investing this money in various tracts and that they did not have an identifiable interest. Plaintiffs then told Catherina that they wanted to invest in one tract separate from other members of the family.

According to the plaintiffs' testimony, Mama presented them with a contract in January, 1956, to buy the land in question—Lots 3 and 4, Sunset View Acres, Washington County. Victor and Madonna both testified that the contract was dated January 1, 1956, and that the sellers were Angelina J. Albino and Anita M. Albino. The sale price was allegedly $8,500, of which $4,250 was acknowledged as having been received as the down payment, and the balance was to be paid at the rate of $50 per month, including interest at 5 percent per annum.[1] The contract was alleged to have been signed by the plaintiffs and Catherina at the latter's home in Beaverton. The contract was not recorded.

[1]There is no documentary evidence that the $4,250 was in fact paid, except a letter from Catherina's attorney in 1963 which states she is holding $7,850 of Mr. and Mrs. Victor Albino's money. There is a strong inference that the $7,850 includes the sum of $4,250.

Angelina J. Albino and Anita M. Albino, both single women in January, 1956, are the sisters of Victor and the daughters of Catherina. Anita testified that in 1956 she was living in California and that she did not sign a contract to sell Lots 3 and 4 of Sunset View Acres. Her sister Angelina was residing in Maryland at the time of the trial. The plaintiffs tried to explain the involvement of Angelina and Anita by saying that it was Mama's custom to place the names of her children on documents in real estate transactions. Victor testified, "I know she had my name down on four or five pieces of property like she had my sisters down on the deal." However, a search of the records of Washington County did not support the plaintiffs' position. Only one quitclaim deed was found—from Joseph Albino to Catherina Albino in 1962.

Commencing in February, 1956, Mrs. Victor Albino each month drew a check in the amount of $50 on a Eugene bank and forwarded it to Catherina Albino in Beaverton. The last check was sent in February, 1962. There were 73 payments of $50 for a total of $3,650.[2] The plaintiffs also paid the taxes on Lots 3 and 4, Sunset View Acres, commencing with the fiscal year 1956-57 through the year 1961-62. The total amount of taxes paid was $603.62. The tax notices, together with a notice of change in assessed valuation, were sent to Marie Anna Bauer, c/o Mrs. Victor Albino, 221 West 13th Avenue, Eugene, Oregon.[3]

---

[2] There are no cancelled checks for five monthly payments. A handwritten note was received in evidence with the cancelled checks. It reads:

"Jan. 19, 1958. Mama borrowed $200 to go to Reno. She requested this amount to be applied toward our loan making our payments completed for months Feb., Mar., April, May and June as interest for this advance. * * * Our next payment will be due July 1, 1958. * * * Mama said, 'Get something for your anniversary.'"

[3] Two separate tax notices for the fiscal year 1958-59 were prepared in pencil. On both notices the addressee had been obviously erased and the name and address "Mrs. Victor Albino, 221 West 13th, Eugene, Ore." written over the original writing. The defendant would have us draw the

The plaintiffs testified that on March 1, 1962, Mama Catherina called them in Eugene and wanted them to return to her the contract of January 1, 1956, covering Lots 3 and 4 of Sunset View Acres. She wanted to sell the property for $23,000 and use the money to relieve some financial difficulty. The plaintiffs were reluctant to do this. Finally, the plaintiffs talked to Catherina's lawyer who said that "Mama was in a very great financial bite and unless we would consent to the sale of this property * * * she had a lot to lose."[4] Plaintiffs then consented to mail the contract to the lawyer. Mama promised the plaintiffs on the telephone on that date that "when she got back on her feet * * * she would take care of the responsibility with us." Before mailing the contract to the lawyer, Madonna claims that she typed out and kept a synopsis of it, as follows:

"CONTRACT OF LOTS #3 & #4 SUNSETVIEW

"This contract made January 1st 1956 between Angelina J. Albino and Anita M. Albino both single women of the county of Washington, State of Oregon, hereinafter called the 1st party and VICTOR P. ALBINO and MADONNA ALBINO, husband and wife of Lane County and State of Oregon hereinafter called the 2nd party as hereinafter specified the 1st party hereby agrees to sell

inference that for some undisclosed reason the plaintiffs made these changes. The defendants believe that the original writing was "Mrs. Anita _____, 3775 California Street, San Francisco, California." With a strong magnifying glass the trier of fact could reach the conclusion that the original writing read: "Marie Anna Bauer, 3775 California Street, San Francisco, California." The plaintiffs both testified that they did not direct the tax collector of Washington County to send any tax notices to them in Eugene.

[4] It was reported at the trial that the lawyer had moved to Lane County. He was not called as a witness. If there was a contract of January 1, 1956, wherein Angelina J. Albino and Anita M. Albino agreed to sell Lots 3 and 4 of Sunset View Acres to Victor P. Albino and Madonna Albino, it was not introduced into evidence. The defendants contend that such a document never existed.

Plaintiffs introduced a federal tax lien against Catherina Albino dated October 9, 1963, in the amount of $16,952.54. To show Catherina's good financial condition, another lawyer testified that he settled a personal injury claim for her in 1961 for the sum of $15,000.

and the 2nd party agrees to purchase, the following described real estate, situated in the County of Washington State of Oregon, towit:

"Lots #3 and #4 Sunset View, Washington County, State of Oregon for the sum of $8,500 on account of which $4,250 is paid on the execution hereof (the receipt of which is hereby acknowledged by the 1st party) and the remainder to be paid to the order of the 1st party with interest at the rate of 5% per annum on the dates and in the amounts as follows:

"At the rate of $50.00 per month, which will include principle [sic] and interest. The First payment will be due of the 1st doy [sic] of February, 1956 and the 1st of each month thereafter until the full amount is paid."

In March, 1962, Catherina sold Lots 3 and 4 of Sunset View Acres to Robert E. and Virginia L. Nelson for the sum of $23,000. The purchasers paid the sum of $3,600 cash and gave to Mama a mortgage in the amount of $19,400, payable at the rate of $300 per month including interest at the rate of six percent per annum. The plaintiffs received no money from this sale.

Unknown to the plaintiffs, Catherina Albino had contracted on February 4, 1956, to purchase Lots 3 and 4, Sunset View Acres, from Marie Anna Jacobsen, formerly known as Marie Anna Bauer, for the sum of $7,300, with $1,000 to be paid down and the balance to be paid at the rate of $75 per month.[5] This contract was recorded. By the time of the sale to the Nelsons in March, 1962, the contract balance had been reduced to approximately $1,600.

According to the plaintiffs, they gave Mama time to resolve her financial problems before they contacted her concerning the proceeds due them from the sale of the lots in Sunset View Acres. She kept reassuring them, saying, "Hold on. Everything will work out all

---

[5]Madonna testified that when Mama was negotiating the sale of this property to the plaintiffs in January, 1956, she wanted payments of $75 per month, but the plaintiffs could afford only $50 per month.

right." Finally, in 1963 or 1964, she told them that she had not needed their contract on the lots because they had not recorded it. Plaintiffs claim that this was the first indication that they were going to have trouble recovering their money.

On August 7, 1963, Catherina's attorney in Portland sent the following letter to the plaintiffs:

"Dear Mr. and Mrs. Albino:

"We have been requested by Mrs. Catherina Albino to write you concerning the return of the funds which you have advanced to her over a period of years. According to her records, she is holding the sum of $7,850.00 which she is willing to return.

"However, this is contingent upon your executing a deed to her conveying any interest you may have in Lot 1, Steele's Addition, for which she would pay you an additional $1,000.00. Of course, she recently gave you a check for $500.00 which would be deducted from the total you would receive.

"We would appreciate an answer in the near future concerning this matter.

"* * * * *"[6]

The $500 check referred to in the letter is dated June 24, 1963.

It was the plaintiffs' testimony that they made continuous attempts to obtain the money from the sale of the lots through requests of Catherina and later by talking to defendant Frank and to Victor's brother, Father Tony. Frank had remarried Catherina in 1970. Father Tony was a Catholic priest stationed in Beaverton and plaintiffs testified that "we all looked up to him." Father Tony and Frank listened to the plaintiffs but demanded "proof" of their claim. The plaintiffs were reluctant to hire a lawyer for a family argument, even though Father Tony had recommended it as far back as 1962:

"Q What did you tell him in '62?

---

[6]It is unclear whether the plaintiffs answered this letter. No answer was received in evidence.

"A    Victor came up and said that Mom wouldn't pay him this money. I went to Mother and asked, I said, 'You owe Vic some money,' I said. She said, 'I don't owe him that much.' And Victor—she was adamant to the fact that she didn't owe him that much. I told Vic if he had proof he should go get a good lawyer and collect it."

In 1974 the plaintiffs hired their present lawyer, and this action was filed in April, 1975.

The complaint and the proof show that one or both of the defendants made the following payments to one or both of the plaintiffs: (1) $500 in June, 1963; (2) $1,000 in January, 1965; (3) $1,000 in August, 1970; (4) $500 in August, 1971; and (5) $500 in November, 1971. We are of the opinion that an examination and analysis of some of the written documents in this case will lead to the proper resolution of disputed questions of fact.

1. *Seventy-three payments of $50 each*

From February, 1956, through February, 1962, the plaintiffs sent Mama payments totaling $3,650. The first check corroborates the plaintiffs' testimony that the payments on the contract to purchase the lots in the Sunset View Acres were to commence in February, 1956. The date of the last check supports the plaintiffs' contentions regarding the approximate time of the return of the contract to Mama.

The defendants argue that the payments were made pursuant to the June, 1951, contract for the purchase of the lot in Steele's Addition rather than to the 1956 contract to purchase the lots in Sunset View Acres. Under the 1951 contract, Catherina and Madonna were each obligated to pay the sum of $50 per month commencing on August 1, 1951. The defendants argue that the plaintiff had a credit of $4,250 with Mama when the contract was executed to purchase the lot in Steele's Addition, that this credit was not exhausted until February, 1956, and that the

plaintiffs then started making payments of $50 per month.[7]

If the defendants' argument were correct, the $4,250 credit granted the plaintiffs would relieve them from making $50 monthly payments for seven years and one month. But the plaintiffs started making the payments only four years and six months after execution of the contract to purchase the lot in Steele's Addition. The defendants were unable to explain this discrepancy of over two and one-half years.[8]

## 2. *Tax Statements for 1956-57 through 1961-62*

There are tax statements for six separate tax years. They are all addressed to Marie Anna Bauer, c/o Mrs. Victor Albino, 221 West 13th Avenue, Eugene, Oregon. Evidently, the defendants would have us believe that the plaintiffs surreptitiously took these statements from Mama's home in Beaverton, changed the name of the addressee, and then paid the tax. Each statement is marked paid on a different date by a machine stamp. Two of the statements for 1958-59 are addressed in pencil and, as we have explained in footnote 4, they contain an obvious erasure. This appears to be a human mistake committed by the person who prepared the statements. The remainder of the statements contain no erasures. The statement for 1961-62 and the notice of change in assessed valuation were addressed by means of an addressograph plate.

It defies all logic to believe that the plaintiffs would pay a total of $603.62 taxes over a six-year period on a tract of real property in which they had no interest. We cannot assume that the plaintiffs thought that they could obtain title to the land based only upon the payment of taxes. The tax collector of Washington

---

[7]The proof does not conclusively show when the $4,250 credit was acquired. Plaintiffs contend only that it was acquired prior to January, 1956.

[8]Even if we were to accept the defendants' further argument that $500 of the $4,250 credit was applied as a down payment, a discrepancy of one year and nine months would remain.

[ 547 ]

County would send a tax notice to an unrecorded purchaser only if he were told to do so. There is a strong inference that either the plaintiffs or Catherina gave the information to the tax collector.[9]

3. *Letter of August 7, 1963, from Catherina's attorney to plaintiffs (text set out above)*

This letter says that over a period of years the plaintiffs advanced to Catherina Albino the sum of $7,850, which she was willing to return. This $7,850 must have been a combination of the 73 monthly payments of $50 each for a total of $3,650 and the credit of $4,250 which the plaintiffs claim was the down payment on Lots 3 and 4 of Sunset View Acres (the total is $7,900, for an excess of $50, but no other sums logically fit).

The letter constitutes an authorized admission that on that date Catherina owed the plaintiffs the sum of $7,850. This is consistent with Catherina's statement to Father Tony in 1962 that she owed the plaintiffs some money, but not as much as they were claiming.

4. *Letter from Nelsons' attorney to Pacific Title Insurance Company dated March 6, 1962.*

The Nelsons were the purchasers of Lots 3 and 4, Sunset View Acres, from Mama. Pacific Title was the escrow agent. This letter says, in part: "It is contemplated that you will pay off the Albino-Bauer contract in the approximate sum of $1,600."[10] This confirms what the plaintiffs claim Mama's attorney told them on the telephone on March 1, 1962.

---

[9]The plaintiffs said they did not. Catherina cannot testify for herself. The contract from Marie Anna Jacobsen, formerly Marie Anna Bauer, to Catherina was recorded in February, 1957. It provided that the purchaser would pay all taxes. Normally, the tax notices would have been sent to Catherina.

[10]The quoted payoff of approximately $1,600 is consistent with the plaintiffs' theory. Plaintiffs claim that under the contract of January 1, 1956, there was a balance due of $4,250 payable at the rate of $50 per month including interest at the rate of 5 percent per annum. By applying each payment made by the plaintiffs first to interest and then to principal, we find that the balance due after the last payment on February 6, 1962, was the sum of $1,540.79.

### 5. *Card from Mama to Victor dated August 15, 1965*

This card is written partly in English and partly in Italian. The undisputed translation of a portion of the message is, "I'm going to send you $1,000 on account and when I see you we'll talk."

The written documents which we have reviewed are all consistent with and corroborate the testimony of the plaintiffs, except their allegation that Angelina J. Albino and Anita M. Albino were the sellers of Lots 3 and 4 of Sunset View Acres under a contract of January, 1956, to the plaintiffs. The record in this case conclusively establishes that Angelina and Anita were never the owners of the property. But we conclude that this discrepancy should not affect our decision. It may be that the plaintiffs were mistaken about the names of Angelina and Anita appearing on the document. They would have no apparent motive to fabricate the story—as pointed out by plaintiffs' counsel, a fabrication would only complicate their case. The plaintiffs are not suing to specifically enforce the alleged contract of January, 1956. The purpose of the suit is to place a constructive trust upon the proceeds of the sale of the lots in Sunset View Acres by Catherina. The plaintiffs gave Catherina permission to sell the lots for the sum of $23,000 and to use the money temporarily to relieve a short-term personal financial crisis. Since the sale in March, 1962, Catherina has paid the plaintiffs only the sum of $3,500. Should a constructive trust be imposed on the balance by operation of law?

A simple definition of "constructive trust" is as follows:[11]

> "The constructive trust may be defined as the device used by chancery to compel one who unfairly holds a property interest to convey that interest to another to

---

[11] 4 Scott on Trusts 3101, § 462 (2d ed 1956): "Many attempts to define or describe a constructive trust would seem to be inadequate because the definition or description is too narrow in its scope and fails to include important types of constructive trusts."

whom it justly belongs." 6 Bogert, Trusts and Trustees 3-5, § 471 (2d ed 1960).

The same text, at page 7, explains:

> "Obviously this constructive trust is not the product of the intent of the parties. It is not enforced because the parties expressed a desire to have a trust and performed the necessary conveyancing acts. It is merely a tool of the court to work out an equitable result in the simplest fashion. It is created regardless of the intent of the parties, and naturally directed against the intent of the defendant. * * *" (Footnotes omitted.)

*See also Fouchek v. Janicek,* 190 Or 251, 261, 225 P2d 783 (1950); *Alexander v. Central Ore. Irrig. Dist.,* 19 Or App 452, 465-66, 528 P2d 582 (1974).

■ Proof of a constructive trust must be by strong, clear and convincing evidence. *Evans v. Trude et al and Champlin et al,* 193 Or 648, 658, 240 P2d 940 (1952); *Hughes v. Helzer,* 182 Or 205, 226, 185 P2d 537 (1947); *Davis v. Howard,* 19 Or App 310, 527 P2d 422 (1974). "Clear and convincing evidence means that the truth of the facts asserted is highly probable." *Supove v. Densmoor,* 225 Or 365, 372, 358 P2d 510 (1961), *citing Heise v. Pilot Rock Lbr. Co.,* 222 Or 78, 352 P2d 1072 (1960).

■ A constructive trust arises where a person in a fiduciary or confidential relationship acquires or retains property in violation of his duty to the grantor.[12] The confidential relationship must be one upon which the grantor justifiably can and does rely. It is not necessary to prove fraud or intent not to perform by the fiduciary or confidant. 4 Scott on Trusts 3216, § 495 (2d ed 1956); 76 Am Jur 2d 458, § 236; *Shipe v. Hillman,* 206 Or 556, 565, 292 P2d 123 (1956); *Hanscom v. Irwin,* 186 Or 541, 564, 208 P2d 330 (1949); *Bowns v. Bowns,* 184 Or 603, 614, 200 P2d 586 (1948).

---

[12] "In a case where confidential relations, such as husband and wife, parent and child, exist, the betrayal of such a confidence itself raises a constructive trust." *Meek v. Meek,* 79 Or 579, 591, 156 P 250 (1916).

"* * * The tendency of the courts is to construe the term 'confidence' or 'confidential relationship' liberally in favor of the confider and against the confidant, for the purpose of raising a constructive trust on a violation or betrayal thereof [citing *Bowns v. Bowns, supra*]. A parent and child, grandparent and child, or brother and sister relationship is not intrinsically one of confidence, but under certain circumstances involves a confidence the abuse of which gives rise to a constructive trust in accordance with the terms of an agreement or promise of a grantee to hold in trust or to reconvey." 76 Am Jur 2d 458-459, Trusts § 236.

■ We find in this case that a confidential relationship existed between the plaintiffs and the defendant Catherina.[13] The Albinos were a closely knit family. Between 1951 and 1962 the plaintiffs forwarded to Mama at least $7,850 without any type of accounting. Madonna felt that Catherina was a "very great businesswoman." Victor testified, "* * * [T]he feelings I had for my mother was just implicit trust. I mean, she could do anything and I would never doubt it."

All of the essential elements of the plaintiffs' case have been established by clear and convincing evidence. We find particularly persuasive the 73 checks of $50 each, totaling $3,650, and the tax statements and receipts from 1956-57 through 1961-62. These show beyond any doubt that the plaintiffs had an interest in the lots in Sunset View Acres. The letters received in evidence lead to the conclusion that the plaintiffs owed a balance on the lots of approximately $1,600 in 1962. The sale price to the Nelsons of $23,000 is undisputed. It is also undisputed that the plaintiffs have been repaid only $3,500 by the defendants.

---

[13]There are at least two Oregon cases in which this court found that a confidential relationship existed between parent and child. *Evans v. Trude et al and Champlin et al*, 193 Or 648, 655, 240 P2d 940 (1952), and *Meek v. Meek*, 79 Or 579, 156 P 250 (1916).

The circumstances of this case lead to the conclusion that when Mama purchased Lots 3 and 4, Sunset View Acres, from Marie Anna Jacobsen, formerly Marie Anna Bauer, she intended to hold the property for the benefit of the plaintiffs. It is apparent that Mama used the plaintiffs' money to make the payments. By operation of law a resulting trust was created. *Shipe v. Hillman, supra* at 564, *citing Unterkircher v. Unterkircher,* 183 Or 583, 591, 195 P2d 178 (1948). The resulting trust continued until Catherina violated the confidential relationship and refused to pay the sale price of the property to the plaintiffs, when it was converted into a constructive trust. The confidential relationship was one upon which the plaintiffs had a right to rely.

The defendants' answer contained the following:

"As a FIRST AFFIRMATIVE DEFENSE, Defendants complain that the conduct complained of is more than 13 years old and that Plaintiffs should be barred by laches."

As to the doctrine and defense of laches, the defendant has the burden of proof. *Hanns v. Hanns,* 246 Or 282, 305, 423 P2d 499 (1967); *Alexander v. Central Ore. Irrig. Dist., supra.*

Mama was unable to testify at the trial. The defendants argue that this has prejudiced their case:

"In order to constitute laches there must have been full knowledge of all of the facts, concurring with a delay for an unreasonable length of time, and laches does not start to run until such knowledge is shown to exist. *Wills v. Nehalem Coal Co.,* 52 Or 70, 89, 96 P 528 (1908); *Kelly v. Tracy,* 209 Or 153, 172, 305 P2d 411 (1956). In addition, the delay must result in substantial prejudice to the defendant to the extent that it would be inequitable to afford the relief sought against the party asserting laches as a defense. *Dahlhammer and Roelfs v. Schneider Exec.,* 197 Or 478, 498, 252 P2d 807 (1953); *Hanns v. Hanns,* 246 Or 282, 305, 423 P2d 499 (1967). Thus, the doctrine of laches is not an inflexible rule, but its application depends upon the particular circumstances of each case. *McIver v. Norman,* 187 Or 516, 544,

205, P2d 137, 213 P2d 144 (1949). See also *Willis v. Stager,* 257 Or 608, 618-19, 481 P2d 78 (1971)." *Stephan v. Equitable S & L Assn.,* 268 Or 544, 569, 522 P2d 478 (1974).

Would Catherina's testimony help the defendants' case? It is a debatable question. The plaintiffs have never been allowed to examine her files. It would apparently be very difficult to refute the documentary evidence presented by the plaintiffs. We must remember that plaintiffs' claim was not presented to the defendants for the first time when the complaint was filed on April 29, 1975. The problem was a matter of continuing family controversy from 1962 until the time of the trial. It was discussed within the family and caused arguments at family gatherings.

■  Courts of equity use the statute of limitations of law actions as a yardstick in applying laches.

"Another well-recognized rule is that in cases of this kind courts of equity act by analogy to the statutory limitations of actions at law, and hold that when suit is brought within the time fixed by the analogous statute the burden is on the defendant to show the existence of the circumstances amounting to laches, whereas, if the suit is brought after the statutory time, plaintiff must plead and prove that laches does not exist. *Nelson v. Baker,* 112 Or. 79, 97, 227 P. 301, 228 P. 916; *Baillie v. Columbia Gold Mining Co.,* 86 Or. 1, 23, 166 P. 965, 167 P. 1167; *Wills v. Nehalem Coal Co.,* 52 Or. 70, 90, 96 P. 528." *McIver v. Norman,* 187 Or 516, 545-46, 205 P2d 137, 213 P2d 144 (1949); *Fischl v. Aust,* 279 Or 181, 566 P2d 518 (1977).

■  The analogous law action in this case is the common count of general assumpsit or "money had and received." Although an action at law, money had and received is governed by equitable principles. "The action is liberal in form and greatly favored by the courts." *Smith v. Rubel,* 140 Or 422, 427, 13 P2d 1078, 87 ALR 644 (1932). "An action for money had and received may be found a proper means of enforcing a constructive trust." 6 Bogert, *supra* § 472 at pp. 28-29.

The statute of limitations in Oregon governing actions on implied contracts is ORS 12.080. The action must be commenced within six years. The Oregon statutes further provide:

"Whenever any payment of principal or interest is made after it has become due, upon an existing contract, whether it is a bill of exchange, promissory note, bond, or other evidence of indebtedness, the limitation shall commence from the time the last payment was made." ORS 12.240.

■ The term "existing contract" is generally held to mean a contract either "express or implied." At common law, "the rule as to part payment stopping the running of the statute of limitations is confined to contract, express or implied, for the payment of money." 51 Am Jur 2d 852, § 362.

■ Under the analogous law action of money had and received, the statute of limitations would have been tolled by each of the five payments by the defendants to the plaintiffs.[14]

■ We conclude that the defendants have not carried their burden of proof on the issue of laches.

■ The plaintiffs' complaint requested punitive damages. However, the plaintiffs have not pressed this request either by written brief or oral argument. In Oregon, punitive damages are not recoverable in a court of equity. *Pedah Company v. Hunt,* 265 Or 433, 509 P2d 1197 (1973).

This case is reversed and remanded to the circuit court to impress a constructive trust upon the balance of $17,900 remaining from the sale of lots 3 and 4 in Sunset View Acres after credit is given for the balance due on the Jacobsen-Bauer-Albino contract of $1,600 and $3,500 paid by the defendants to the plaintiffs

---

[14]Madonna testified that the $500 payment in November, 1971, was a gift. The plaintiffs' complaint alleges that the sum on that date is a payment and should be credited to the balance due. The allegation in the complaint is a judicial admission that the amount was a payment and it must be credited to the defendant.

from June, 1963, through November, 1971. The plaintiffs shall also be awarded interest on all deferred balances at the rate of 6 percent per annum. *Marston v. Myers,* 217 Or 498, 514, 342 P2d 1111 (1959).

The proceeds of the sale owed to the plaintiffs may also be traced in the hands of the defendants.

> "Where by the wrongful disposition of another's property the wrongdoer acquires other property, the owner of the property may claim the product in whatever form it may be. The product may be land, chattels, choses in action, or money. * * *" 3 Scott on Trusts 3259, § 508.2 (2d ed 1956).

*See also Jimenez v. Lee,* 274 Or 457, 547 P2d 126 (1976); 6 Bogert, *supra* at 29, § 472.

If the circuit court can trace the funds into the hands of either or both defendants, it shall impose a constructive trust upon the proceeds. If the court cannot trace the funds, then it shall enter a judgment for $17,900 plus interest against the defendant Catherina Albino, but not against the defendant Frank Albino.

Reversed and remanded.