Argued and submitted July 13, affirmed December 7, 1981,
reconsideration denied February 11,
petition for review allowed March 23, 1982 (292 Or 722)
See later issue Oregon Reports

# REXNORD INC. et al
*Appellants,*

*v.*

# FERRIS et al,
*Respondents.*

## (No. A8006-03115, CA 19104)

637 P2d 619

Malcolm E. Wheeler, California, argued the cause for appellants. With him on the briefs were Hughes Hubbard & Reed, California, and Fredric A. Yerke, James N. Westwood, Miller, Nash, Yerke, Wiener & Hager, Portland.

William E. Hurley, Portland, argued the cause for respondents. On the brief were Michael B. Wallstein and Bernard, Hurley, Crawford & Kneeland, Portland.

Before Gillette, Presiding Judge, and Roberts and Young, Judges.

YOUNG, J.

## YOUNG, J.

Rexnord, Inc. (Rexnord) and Nordberg Manufacturing Company (Nordberg) (plaintiffs), brought an action for misappropriation of trade secrets, breach of contract, unfair competition and conversion against defendants Reginald J. Ferris (Ferris), Helser Machine Works, Inc. (Helser) and Reginald J. Ferris and W. Don Miller as partners, doing business as Steton U.S.A. (Steton). Plaintiffs sought a permanent injunction and compensatory and punitive damages. The trial court permanently enjoined defendants and awarded compensatory damages, but denied punitive damages. Plaintiffs appeal, claiming that the scope of the injunction was too narrow and that the denial of punitive damages was error.

Rexnord, a Wisconsin corporation, designs, manufactures and sells machinery. Nordberg is a wholly owned South African subsidiary of Rexnord. One machine manufactured by plaintiffs is a rock crusher. Plaintiffs also manufactured and sold replacement parts for their crushers. The market in replacement parts was profitable and important to plaintiffs' business. Some replacement parts were manufactured by other unaffiliated companies pursuant to licensing agreements or contracts with plaintiffs.

■ The technical information needed to manufacture parts for plaintiffs' crushers appeared in detailed engineering drawings. The trial court found the detailed drawings to be trade secrets, and we agree. The drawings contained details of measurements, manufacturing tolerances, materials specifications, and other important information. Plaintiffs had maintained various safeguards to assure the continued confidentiality of that information. The safeguards included a procedure for recording all engineering drawings that left plaintiffs' possession. All drawings carried a legend "Property of Nordberg Manufacturing Company." All licensed manufacturers in possession of the drawings were required to sign a "confidentiality clause." Plaintiffs had been successful in guarding their trade secrets.

■ Defendant Ferris, a citizen of South Africa, resided there until 1978, when he moved to the United States.

From 1954 to 1974, he was employed by Nordberg. During that employment, he was involved in recommending and designing changes for plaintiffs' crushers and had access to plaintiffs' blueprints, drawings and technical information. While in South Africa, Ferris acquired roughly 200 of plaintiffs' drawings and microfilms and began systematically copying them into a notebook for his own purposes. Ferris testified the drawings belonged to plaintiffs and that he had no right to them. The wrongful nature of his acquisition is clear.

In 1978, Ferris became an employe and officer of Balzer-Pacific Equipment Company (Balzer-Pacific), located in Portland, where he remained until August, 1979. He kept with him some original drawings and microfilms, together with his notebook with the copied drawings. During this employment, Ferris furnished traced copies of plaintiffs' original drawings to other fabricators, who then duplicated and manufactured crusher parts. Ferris used traced copies to prevent plaintiffs from detecting his possession of the original drawings.

In March, 1978, Ferris met defendant Miller, president of defendant Helser. After that meeting, Ferris, while still employed at Balzer-Pacific, assisted Helser in making parts for plaintiffs' crushers. In August, 1979, Ferris left Balzer-Pacific and, with Helser, formed the partnership, Steton, which began to use the misappropriated information to make or repair, or to enable others to make or repair, replacement parts for plaintiffs' crushers.[1]

In the spring of 1980, Ferris and John Allen, chairman of Balzer-Pacific, had a falling out. Ferris was concerned that Allen would disclose that Ferris had misappropriated and wrongfully used plaintiffs' trade secrets. In an effort to erase evidence of his transgressions, Ferris destroyed some of the drawings and microfilms. He did not, however, destroy drawings which he had made by tracing the original drawings or the data taken from the original drawings. One document not destroyed was a drawing that Ferris had made for

---

[1] Ferris' wrongful conduct was shown to have begun while he was still a resident of South Africa. He provided Brakpan Engineering, a South African Company, with plaintiffs' drawings to enable Brakpan to manufacture replacement crusher parts in competition with plaintiffs.

Balzer-Pacific from an original drawing. Having retained a copy of that copied drawing, Balzer-Pacific delivered it to Rexnord in May, 1980.

Initially, plaintiffs were granted a temporary restraining order. On July 14, 1980, the trial court held an evidentiary hearing on plaintiffs' motion for a preliminary injunction. Later, the parties stipulated, and the trial court ordered, that the hearing on plaintiffs' preliminary injunction motion would also be treated as the hearing on the permanent injunction. Pursuant to the stipulation, the trial court granted a permanent injunction based on the following findings of fact, which we adopt:

"1. Plaintiffs' detailed engineering drawings for parts to their rock crushers were trade secrets.

"2. Defendants obtained plaintiffs' trade secrets by improper means.

"3. Defendants used plaintiffs' trade secrets without license.

"4. Defendants' use of plaintiffs' trade secrets constituted a breach of confidence."

The injunction enjoined defendants:

"1. from using, disclosing or disseminating, or attempting to use, disclose or disseminate, directly or indirectly, any trade secret of the plaintiffs;

"2. from copying, disseminating or using any detailed engineering drawings that were obtained, directly or indirectly, from plaintiffs;

"3. from manufacturing, causing to be manufactured, selling, attempting to sell, distributing or causing to be distributed, any parts for crushers manufactured by plaintiffs or for plaintiffs under license, utilizing or employing directly or indirectly any trade secret of plaintiffs.

"* * * * *

"4. to transfer, within 10 days of September 12, 1980, to the plaintiffs all originals and copies, whether made freehand, by photocopying, by tracing or otherwise, of any detailed engineering drawing, schematic, writing, pattern, casting, or other document or thing that any of the defendants made or had made by using any information of any kind taken from any such drawing that was obtained, directly or indirectly, from the plaintiffs."

The decree also provided that all remaining issues (that is, damages) would be reserved for further determination.

■. Plaintiffs present basically two issues on appeal: (1) whether the trial court erred by not permanently enjoining defendants from the manufacture, distribution or sale of any parts for plaintiffs' crushers, regardless of whether defendants did or did not use plaintiffs' trade secrets; and (2) whether the trial court erred in denying punitive damages.

The scope of the decree sought by plaintiffs would have forever barred defendants from making parts for plaintiffs' crushers, even by legitimate means. One legitimate means found by the trial court is a process known as reverse engineering, whereby a competitior's product is examined and tested for measurements, metal composition, and the like, and then duplicated. The trial court concluded that plaintiffs' crusher parts could be duplicated by defendants by the reverse engineering process without using the trade secrets. Accordingly, the trial court determined to be inappropriate the absolute ban sought by plaintiffs. Plaintiffs argue that *McKinzie et al v. Cline et al,* 197 Or 184, 252 P2d 564 (1953), and *Kamin v. Kuhnau et al,* 232 Or 139, 374 P2d 912 (1962), are authority for the injunctive relief they seek.[2] In those cases the trial court issued a permanent injunction prohibiting defendants from manufacturing the plaintiffs' products even by legitimate means, the effect being to foreclose the defendants from the plaintiffs' product market.[3] Injunctions lie within the sound discretion of the trial court. *State Land Board v. Heuker,* 25 Or App 137, 145, 548 P2d 1323 (1976). In *Hickman v. Six Dimen. Cust. Homes,* 273 Or 894, 898, 543 P2d 1043 (1975), the court stated:

"Injunctive relief depends upon broad principles of equity and may, in the discretion of the court, be granted

---

[2] It is questionable whether the injunction in *Kamin* was a total bar, for defendants were enjoined only from making competing products by using ideas and inventions acquired from plaintiffs in the course of a confidential relation. *Kamin v. Kuhnau et al, supra,* 232 Or at 159. It appears that defendants were not excluded from the product market if they were to compete by some legitimate means.

[3] The trial court believed that plaintiffs were protected from *any* illegal means employed by defendants to manufacture or market parts for plaintiffs' crushers by a provision in the decree that if defendants attempted to enter plaintiffs' product market, they would have the burden to show that they did so by completely legitimate means. In practical effect the burden of proof was shifted to the defendants to prove "legitimate means."

or denied in accordance with the justice and equity of the case. [Citation omitted]. *Courts balance the equities between the parties in determining what, if any, relief to give.*" (Emphasis added.)

On balance, we find that the scope of the injunction was proper. *See also, Aerosonic Corp. v. Trodyne Corp.,* 402 F2d 223, 227 (5th Cir 1968).

## Punitive Damages

The parties stipulated that the evidence adduced at the hearing on the preliminary injunction would also serve as the evidence for a permanent injunction. The stipulation included the following language:

"* * * reserving for trial or other disposition at a later date any other issues in the case."

The decree granting the permanent injunction contained a concluding paragraph:

"It is further decreed that all remaining issues in this case, including the claim for damages and punitive damages, shall be reserved for further determination."

Later, at plaintiffs' request, the trial court, pursuant to ORS 18.125, ordered that the permanent injunction be a final decree and that the "* * * remaining issues [damages] are reserved for further determination."

On the evidence submitted at the hearing on the preliminary injunction, and after considering the parties' oral arguments and memoranda, the trial court by supplemental decree awarded plaintiffs $275 in compensatory damages[4] and declined to award punitive damages on the ground that a party who seeks injunctive relief in equity may not recover punitive damages. The court did find, however, that absent this bar, plaintiffs would have been entitled to $35,000 in punitive damages. By that finding the trial judge has positioned the issue squarely for appellate review. In the supplemental decree, which is the final decree, the trial court made the following findings:

"* * * * *

"(2) In improperly obtaining and using plaintiffs' trade secrets, defendants were guilty of willful and intentional misconduct which was the cause of the compensatory damage to plaintiffs * * *.

---

[4] The trial court's award of compensatory damages is not contested in this appeal.

"(3) The imposition of punitive damages against these defendants would deter the defendants and others from engaging in similar conduct in the future. The imposition of punitive damages also is appropriate, in that the defendants' conduct was sufficiently arbitrary and unconscionable to constitute a grievous violation of societal interests.

"(4) If the court is authorized to award punitive damages against defendants and in favor of plaintiffs, the appropriate amount of such damages would be $35,000."

We begin our analysis with the proposition that plaintiffs' primary claim is exclusively in equity, i.e., a suit for a permanent injunction, and the remedy sought is a combination of both equitable and legal relief.

It is a familiar rule that, when equity takes cognizance of a cause, it may retain jurisdiction to grant relief normally obtainable in a court of law. *Olson v. Roop*, 255 Or 368, 469 P2d 437 (1970); *Wells v. Wells*, 252 Or 400, 406, 449 P2d 434 (1969); *Ruby v. West Coast Lumber Co.*, 139 Or 388, 10 P2d 358 (1932). In *West v. Washington Railway Co.*, 49 Or 436, 451, 90 P 666 (1907), the court said,

"A court of equity after acquiring jurisdiction, as incidental to the remedy, may assess such damages as appear to have been sustained prior to the filing of the complaint."

*Fleischner v. Citizens' Invest. Co.*, 25 Or 119, 131, 35 P 174 (1893), instructs why an incidental award of damages in equity does not violate the constitutional right to a jury trial.[5]

The first Oregon case directly considering the power of a court sitting in equity, without a jury, to award punitive damages is *Pedah Company v. Hunt*, 265 Or 433, 509 P2d 1197 (1973). *Pedah* concerned a suit in equity for a permanent injunction to restrain the defendant from using, and publishing under, a particular business name and for general and punitive damages. The trial court granted the injunction and awarded both compensatory and punitive damages. The Supreme Court reversed the award of punitive damages and said:

---

[5] Even in cases where equitable jurisdiction has attached but equitable relief is denied, money damages may be awarded in the proper case. *Wittick v. Miles,* 274 Or 1, 5, 7, 545 P2d 121 (1976) (specific performance); *Walker v. Mackey et al,* 197 Or 197, 210, 251 P2d 118, 253 P2d 280 (1953) (specific performance); *Fisk v. Leith,* 137 Or 459, 464, 299 P 1013, 3 P2d 535 (1931) (injunction).

"The great weight of authority denies the recovery of punitive damages in a suit in equity. It appears to us that the allowance of punitive damages by a court sitting in equity, without a jury, is inconsistent with a court in equity doing justice between the litigants. Therefore, we hold that the plaintiff is not entitled to punitive damages in this equity suit." 265 Or at 436.

Chief Justice O'Connell, in a concurring opinion, said:

"I do not favor the law-equity distinction and I believe that we should do everything we can to eliminate it. However, I also feel that the doctrine of punitive damages should likewise be limited. Faced with this dilemma, I favor the solution adopted by the court with the hope that eventually the distinction between law and equity will be completely eliminated by a frontal attack upon it."

The *Pedah* holding was followed in *Albino v. Albino,* 279 Or 537, 554, 568 P2d 1344 (1977).[6]

Defendants contend that *Pedah* and *Albino* control. Plaintiffs argue to the contrary, based upon the substantial changes in Oregon's procedural law since *Pedah* and *Albino* were decided. Plaintiffs also urge that if defendants are entitled to a jury trial on the issue of punitive damages, then that right was waived. Our inquiry turns to the question of the effect, if any, on *Pedah* and *Albino* of the enactment of the Oregon Rules of Civil Procedure and the simultaneous repeal of ORS 11.020. Oregon Laws 1979, ch 284.

■■ The historical procedural distinctions between actions at law and suits in equity have been abolished by ORCP. The procedural rules are the same, regardless of the remedy. ORCP 2 provides:

"There shall be one form of action known as a civil action. All procedural distinctions between actions at law and suits in equity are hereby abolished, except for those distinctions specifically provided for by these rules, by statute, or by the Constitution of this state."

The rules and the authorizing statute, ORS 1.735, make it clear that ORCP is strictly limited to procedure and do not

---

[6] There is in contrary authority, where, as in Oregon, the distinctions between actions at law and suits in equity and the forms of those actions and suits have been abolished. See, for example, *I.H.P Corp. v. 210 Central Park South Corp.,* 228 NY Supp 2d 883, 16 App Div 2d 461 (1962).

change the substantive distinctions between law and equity. ORS 174.590; *see also,* 1980 Oregon Civil Procedure Rules, Oregon Law Institute, December, 1979, at 225. The rules do not and could not alter the constitutional right to a jury trial. Or Const, Art I, § 17, and Art VII (Amended) § 3. ORCP 50 provides:

> "The right of trial by jury as declared by the Oregon Constitution or as given by a statute shall be preserved to the parties inviolate."

Plaintiffs contend that, by reason of the enactment of ORCP and the abolition of the common law distinction between actions at law and suits in equity by repealing ORS 11.020,[7] there is no longer any rational basis to deny a court exercising equity jurisdiction the power to award punitive damages. That the "frontal attack" called for by Chief Justice O'Connell in his concurring opinion in *Pedah* was precisely the result of the 1979 legislation, is suggested by ORCP 18B and 24A, which permit the pleading of alternative types of relief and joinder in a complaint of legal and equitable claims. Even before the enactment of ORCP the Oregon Supreme Court observed that the trend in our law is to encourage the disposition of legal and equitable claims in one proceeding. *Troutman v. Erland-son,* 287 Or 187, 204, 598 P2d 1211 (1979).

██ Even though plaintiffs' argument is not without sub-stance, it is our opinion that punitive damages are peculiarly within the jurisdiction of the law side of the court. For example, we have found no statement in the case law of this state that punitive relief is incidental or ancillary to injunctive relief in equity. Further, entitlement to punitive damages is rooted in the concept that there must be a violation of "societal interests" of sufficient magnitude to justify an award of punitive damages. *Millikin v. Green,* 283 Or 283, 583 P2d 548 (1978); *Starkweather v. Shaffer,* 262 Or 198, 497 P2d 358 (1972); *Pedah Company v. Hunt, supra,* 265 Or at 436.

---

[7] ORS 11.020 provides:

> "The enforcement or protection of a private right, or the prevention of or redress for an injury thereto, shall be obtained by a suit in equity in all cases where there is not a plain, adequate and complete remedy at law, and may be obtained thereby in all cases where courts of equity have been used to exercise concurrent jurisdiction with courts of law, unless otherwise specially provided by statute."

We are satisfied that punitive damages cannot be awarded other than by a jury, absent a waiver of the right to a jury trial. *But see, 2 D's Logging v. Weyerhaeuser,* 53 Or App 677, 688-89, 632 P2d 1319 (1981).

## Trial by Jury

 Therefore, we must determine if defendants waived the right to a trial by jury on the issue of punitive damages. Jury trials are regulated by ORCP. ORCP 51C(1) states:

"The trial of all issues of fact shall be by jury unless:

"The parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record, consent to trial without a jury;"

Under that rule, "consent" requires *affirmative* action by a stipulation. The stipulation of the parties did not constitute consent to a trial without a jury. The words of the stipulation, "* * * reserving for trial or other disposition at a later date any other issues in the case," cannot by any reading be interpreted to constitute a consent by the defendant to try the punitive damage issue without a jury.

Affirmed.