Argued and submitted January 6, affirmed July 15, 1998

Robert S. LOZANO
and Judy H. Lozano,
*Appellants,*

*v.*

SUMMIT PRAIRIE CATTLEMENS ASSOCIATION
aka Summit Prairie Stock Association,
aka Summit Prairie Cattle Association
and B.F.C. Edmondson,
*Respondents.*

(91-2707-L-1; CA A94281)

963 P2d 92

Benjamin Lombard, Jr. argued the cause for appellants. With him on the briefs were Lombard, Knudsen & Holtey, LLP and William F. Schroeder.

Joseph E. Kellerman argued the cause for respondents. With him on the briefs was Blackhurst, Hornecker, Hassen & Ervin B. Hogan.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

## WARREN, P. J.

Plaintiffs own a ranch near Butte Falls on which they raise cattle. They seek a declaration that defendant Summit Prairie Cattlemens Association (Summit) is the trustee of certain federal grazing rights that the former owner of their ranch assigned to Summit and that Summit breached the trust by assigning those rights to defendant B. F. C. Edmondson, one of its members. The trial court found for defendants. We review *de novo*, ORS 19.415(3), and affirm.

In the 1960s, Naomi Fredenburg (Fredenburg) and her husband owned and operated the ranch that plaintiffs now own. As is common with cattle ranchers in the area, as throughout much of the West, their operation included two general categories of land. First, they owned title to the base ranch, the property that plaintiffs now own. At the base ranch, they had their home, grew hay for winter feed, and kept their herd during the winter months. Second, as an essential part of their operation they ran their cattle on nearby lands that belonged to the Medford Corporation (Medco) and the Bureau of Land Management (BLM). Those nearby lands provided spring and summer pasturage for their cattle; the base ranch by itself could not have supported a herd of the size that they kept. The Medco and BLM lands are interspersed in a checkerboard pattern, so the most efficient operation required authority to use land that both entities owned.

Summit is an association of ranchers in the area whose primary purpose is to lease land from Medco and allot it among its members. Medco preferred to lease to associations rather than individuals because of the administrative convenience of a larger lease. The Fredenburgs were members of Summit and received allotments of Medco land from it.

Before 1968, the BLM required ranchers to lease their grazing lands from it directly; the BLM would not lease to associations as Medco did. A BLM lessee was required to own or lease a base ranch in the vicinity of the grazing lease. BLM leases lasted only for one year at a time, but a lessee

who used the leased land at or near to the authorized capacity, and who remained otherwise eligible for a lease, had a preference for renewal. Otherwise, other qualified ranchers could receive the lease for the next year.[1] The Fredenburgs leased lands from the BLM that complemented their allotments of Medco lands from Summit.

Fredenburg's husband died in 1964. She soon decided that she could not continue the operation on her own. She placed the ranch on the market no later than 1966 but was unable to sell it until 1973. In the first years after her husband's death, Fredenburg attempted, with decreasing success, to keep the ranch operating while she looked for a purchaser. By 1968, she was not able to run enough cattle to maintain her BLM lease and was in danger of losing her BLM rights to conflicting applications from other ranchers. Because the leased land was essential to a cattle ranching operation, and because under the BLM's rules a purchaser could succeed to her rights to lease BLM land, protecting the preferential right to renew the lease was an important aspect of marketing the property.

At about the same time that Fredenburg was experiencing these problems, the BLM decided for administrative reasons to lease its lands to associations whenever possible, as Medco did, rather than to continue leasing to individual ranchers. This combination of conditions led Fredenburg to agree to assign her BLM lease, except for one quarter-section, to Summit, in the belief that she would be able to recover her rights if she found a buyer for the ranch. At a special meeting in May 1968, Summit agreed to accept the lease and to seek to obtain that of one other rancher who had moved from the area and ceased operations. Fredenburg was the secretary of the meeting and prepared the minutes. Those minutes state that Summit acted "with the understanding that [Fredenburg] would have the first rights to come back onto the available grazing land."

---

[1] The parties discuss a number of other characteristics of BLM grazing leases, including the specific nature of a lessee's rights under them. We do not need to resolve a number of the issues that they discuss. It is sufficient for the purposes of this opinion to treat a BLM lease as granting a specific property right to the lessee, as plaintiffs assume, although that treatment may not in fact be correct.

After the meeting, Fredenburg wrote the other affected rancher concerning Summit's action. She explained that it was a hurried business and that the other rancher and she had "fallen into a jam" between a neighboring association and a third rancher, who had been pushing the BLM to report lease violations that, Fredenburg believed, the BLM would prefer to ignore.[2] Fredenburg told him that, while the meeting "looked like railroading" it was really an attempt to keep the neighboring association from taking away his rights forever. She explained that "[t]his way you and I both have a chance left to come back onto the range if we sell or have more cattle." In June, Medco's treasurer wrote Summit, explaining his understanding that, should Fredenburg again start to run cattle and rejoin Summit, she would have a right to graze the same number of head on Medco land that she had previously grazed. After Summit accepted the terms of the Medco letter, Fredenburg formally assigned her BLM lease to it.

Fredenburg executed the assignment of her BLM lease in August 1968, and Summit thereupon authorized Edmondson to use those BLM rights. Some time in the early 1970s the BLM determined that its new policy of leasing lands to associations rather than individuals did not comply with the applicable statutes and rules. It therefore returned to its previous practice of leasing only to individuals. In 1971, Summit formally reassigned the Fredenburg BLM lease to Edmondson, who has held it ever since.[3] According to Edmondson, this was the time when the BLM reverted to its previous policy of leasing only to individuals; testimony from a BLM official suggests that the change came a year or two later.

In 1973, Fredenburg sold her ranch to More and his wife. More primarily worked in the timber and lumber business but did keep a few cattle, some of which Edmondson permitted him to run on the formerly Fredenburg Medco and

---

[2] Presumably, the result of the BLM acting on those violations would be that the other rancher and Fredenburg would lose their leases, possibly giving the third rancher an opportunity to take them over.

[3] Fredenburg became an inactive member of Summit in 1970. Edmondson asserts that, nevertheless, she was at the 1971 meeting when Summit assigned the lease to him; Fredenburg denies being there. We do not need to resolve the dispute for the purposes of this decision.

BLM land that Edmondson now controlled. Fredenburg did not tell More about any remaining BLM lease rights before he bought the ranch, and More did not ask about them. In 1983, More sold the ranch to plaintiffs, who have used it as a cattle ranch ever since taking possession. They investigated the grazing rights before purchasing the ranch but did not learn of the Fredenburg lease until 1985; Fredenburg has since assigned her rights to them. Summit has given plaintiffs the right to use Fredenburg's former Medco lands, but Edmondson has retained the lease to her former BLM lands.

From these facts plaintiffs allege that Fredenburg's transfer of her BLM rights to Summit created either an express, resulting, or constructive trust under which Summit held the rights for her benefit and that of her successors. Based on that view of the facts, plaintiffs assert that Summit and Edmondson (who, as well as receiving Fredenburg's leases, was actively involved in getting her to assign her rights to Summit), breached the trust. They seek to recover the right to the former Fredenburg BLM leases.

██ The Supreme Court has discussed the various kinds of trusts in a number of cases. It has given a general definition of a trust:

> "A trust is an equitable obligation, either express or implied, resting upon a person by reason of a confidence reposed in him to apply or deal with property for the benefit of some other person, or for the benefit of himself and another or others, according to such confidence." *Templeton v. Bockler*, 73 Or 494, 506, 144 P 405 (1914); *see also Shipe et al v. Hillman*, 206 Or 556, 562, 292 P2d 123 (1956) (quoting *Templeton*).

An express trust is one in which the circumstances show that the grantor of the property intended to create a trust. A resulting trust is one in which the circumstances show that, while the grantor may not have expressly intended to create a trust, the grantor also had no intention to give the beneficial interest in the property to the grantee. *Belton v. Buesing*, 240 Or 399, 405-06, 402 P2d 98 (1965). A constructive trust can arise when the transaction does not create an enforceable express or resulting trust. It is a remedial measure that

equity invented in order to avoid unjust enrichment in situations where there is no other available equitable remedy. *Id.* at 409.

An essential aspect of an express or a resulting trust is that the putative trustee has received property under conditions that impose a fiduciary duty to the grantor or a third person. A mere contractual obligation, including a contractual promise to convey property, does not create a trust. *See Restatement (Second) of Trusts* § 13. The imposition of a constructive trust requires a confidential or fiduciary relationship between the putative trustee and the putative beneficiary. *See Hollen v. Fitzwater,* 125 Or App 288, 292, 865 P2d 1298 (1993), *rev den* 319 Or 80 (1994). Proof of the elements of a constructive trust must be "by strong, clear and convincing evidence." *Albino v. Albino,* 279 Or 537, 550, 568 P2d 1344 (1977). In this case these essential elements are missing.

We first consider whether the evidence shows an express or resulting trust. Fredenburg assigned her BLM lease rights to Summit because she was on the verge of losing them to competing applications from neighboring ranchers. She had not been able to use the leases to the required capacity and thus was unlikely to be able to assert any renewal rights. By assigning her rights to Summit, she retained the possibility of being able to regain the leases if her situation changed—for instance, if she found a buyer for the ranch for whom the rights were essential to deciding to purchase—rather than the certainty of the rights disappearing from her control forever.

Before Fredenburg assigned her rights to Summit, the association agreed that she would have "the first rights to come back onto the available grazing land" if she or a purchaser were able to do so. There is no reference to this provision in the written assignment that she executed and that was filed with the BLM. Rather, it was simply an agreement between Fredenburg and Summit that gave Fredenburg a contractual right to a reconveyance of the grazing rights, provided that she was again able to use them. Nothing about the assignment required Summit to use the leases for her benefit or otherwise to consider her interests before she became able to exercise that contractual right. Summit accepted the

assignment primarily to serve its own purposes, including keeping the BLM rights out of the hands of a neighboring association, not to benefit Fredenburg. She did not have an absolute right to reconveyance on demand but only the first rights to the leases if she again qualified for them. The circumstances as a whole do not lead us to conclude that Fredenburg intended to create an express trust of the BLM rights.

For similar reasons, we do not conclude that the assignment created a resulting trust. The circumstances show, if anything, that Fredenburg intended Summit to have the beneficial interest in the BLM rights. Her contractual right to regain those rights for herself or her purchaser did not constitute the retention of any immediate beneficial interest in them, which would be necessary for the creation of a resulting trust.

We next consider whether the evidence is clear and convincing that it is equitable to impose a constructive trust on the lease rights. A constructive trust may be appropriate when a conveyance is induced by the agreement of a fiduciary or confidant to hold the property in trust for a reconveyance, where the fiduciary or confidential relationship is one on which the grantor justly can and does rely, and where the breach of the agreement is an abuse of the confidence. *Shipe et al.*, 206 Or at 565. The same may be true when the conveyance is induced by fraud. *See* Note, *Constructive Trusts in Real Property—Review of Oregon Cases*, 11 Or L Rev 393, 397-401 (1932).

We cannot find by clear and convincing evidence either that Summit or its members induced the assignment of the lease rights by fraud or that they were in a confidential or fiduciary relationship with Fredenburg at the time of the conveyance. There is no question that Fredenburg felt some pressure to make the conveyance; she expressly stated that it looked like railroading. That pressure, however, came more from her own inability to maintain a sufficient operation to keep the lease rights and from the attempts of other ranchers to acquire them than from Summit's actions. Summit's willingness to accept the assignment of the BLM leases on terms

that might allow her to regain the rights to them undoubtedly reflected its members' desire to help her when she was in a difficult situation. That does not mean that Summit or its members were in a confidential or fiduciary relationship to her. She understood that she had no more than a possibility of ever regaining the lease rights and that Summit would have indefinite control of them. Whatever their subjective motives, Fredenburg and Summit dealt at arms' length, not in a confidential or fiduciary relationship.

In short, after the assignment, Fredenburg's rights were contractual rather than subject to a trust of any kind. Because plaintiffs do not raise any contractual issues, we do not discuss the nature of those rights or whether they might have any continued existence. We do not need to consider any of the other issues that the parties raise. The trial court correctly entered judgment for defendants.

Affirmed.